WILLIAM McELWEE, JOHN BOSLEY, and others, *vs.*
JAMES P. FERGUSON, Executor of SAMUEL R.
McELWEE, deceased.

*Testamentary Capacity—Suicide not to be regarded as proof per se
of Insanity—The Will of a Suicide sustained.*

The act of self-destruction cannot be judicially regarded as proof *per se* of
insanity. It is but a fact, together with all other facts in the case, from
which the Court or jury are to determine the testamentary capacity of the
testator, not at the time of committing suicide, but at the time of the execu-
tion of the will in question.

The question of "sound" or "unsound mind" must depend upon the facts and
circumstances of each particular case.

A person recovering from an attack of *mania a potu,* made his will, and on the
following day committed suicide. The Court being of opinion, upon con-
sideration of all the circumstances of the case, that the testator was possessed
of testamentary capacity at the time of making the will, sustained it.

APPEAL from the Orphans' Court of Baltimore City.

This appeal was taken by the caveators, from the decree
of the Orphans' Court of Baltimore City, overruling their
objections to the will of Samuel R. McElwee, and admit-
ting the same to probate.

The cause was argued before BARTOL, C. J., BRENT, MIL-
LER, ALVEY and ROBINSON, J.

*John C. King,* for the appellants.

The testator had not at the making of the will, a "sound
and disposing mind," as required by the express language
of the Code. He was the victim of a disordered mind,
and of delusions and hallucinations—the unequivocal evi-

dences of insanity. *Art.* 93, *sec.* 300, *of the Code; Redfield on Wills, sec.* 9 ; *Taylor's Med. Jur.*, 629 ; *Ray's Med. Jur., sec.* 129, (*Ed.* 1860 ;) 1 *Redfield on Wills, sec.* 10, *pp.* 71, 72 ; *Wharton & Stillé, sec.* 185.

To be sane, the mind must be perfectly sound, otherwise it is unsound, and " where there is delusion there is insanity." A sound mind is one wholly free from delusion. 1 *Redfield on Wills,. sec.* 11, *pp.* 78, 79.

A will which is the direct offspring of partial insanity is invalid, although the general capacity is unimpeached. 1 *Redfield on Wills, pages* 78, 79 ; *Boyd vs. Ely,* 8 *Watts,* 71 ; *Potts vs. House,* 6 *Ga.,* 324 ; *Townshend vs. Townshend,* 7 *Gill,* 10.

The act of suicide in this case, was not the result of sudden impulse at the time when committed, but the result of a condition of mind and body previously existing and well defined, anticipated even by the friends of the testator as well as by his physicians. If suicide committed by the testator soon after making his will, is not conclusive evidence of insanity, a person's state of mind and body which is clearly demonstrated to have produced the act, is conclusive evidence of insanity. 1 *Redfield on Wills, sec.* 14, *pp.* 111, 117. This is the distinction between the case under consideration, and cases like *Burrows vs. Burrows,* 1 *Hagg.,* 109 ; *Duffield vs. Morris, Ex'r,* 2 *Harrington,* 375, and another class of cases under life insurance policies. Could any life insurance company avoid its policy upon the evidence of this case? Most unquestionably not.

The evidence in this case does not establish a lucid interval at the time of the making of the will. There was no manifest change in his condition whatever at that time. What are known as "lucid intervals," arises in a wholly different class of cases. *Gombault vs. Public Adm'r,* 4 *Brad. R.,* 226 ; *White vs. Wilson,* 13 *Vesey,* 87 ; 1 *Redfield on Wills, sec.* 14.

McElwee, *et al. vs.* Ferguson, Ex'r.

This will is, manifestly from the evidence, the result of mental unsoundness in a form of disease known as suicidal mania, recognized at the time as the actual condition of the testator's mind. It is repugnant to the requirements of the testamentary law in this regard, and we respectfully submit that the judgment below should be reversed.

*James McCurley, Jr.* and *N. M. Pusey*, for the appellee.

The essential requisites to constitute a valid testamentary act, (the formalities of the law with reference to the execution of the will, having been complied with,) are, that the testator, *at the time of the execution thereof*, was capable of understanding the business in which he was engaged, the property he desired to dispose of, the object of his bounty named in the will, and that the same was his free and voluntary act. *Waters, et al vs. Waters*, 35 *Md.*, 536, 547 ; *Higgins, et al. vs. Carlton*, 28 *Md.*, 115, 125, 144; *Harrison vs. Rowan*, 3 *Wash. C. C. Rep.*, 586 ; *Hathorn vs. King*, 8 *Mass.*, 371; *Potts, et al. vs. House*, 6 *Ga.*, 324 ; *Stevens vs. Vancleve*, 4 *Wash. C. C. Rep.*, 262 ; *Kinne vs. Kinne*, 9 *Conn.*, 102.

The allegation in the caveat of undue influence, deceits, &c., has not been sustained by the evidence; in fact *there is no evidence pointing in that direction.* The law, in regard to the undue influence, which will invalidate a will, is well settled in this State. *Tyson, et al. vs. Tyson's Ex'rs*, 37 *Md.*, 567, 582.

It is equally well settled, that in a caveat to a will, charging the want of testamentary capacity on the part of the testator, *the burden of proof rests upon the caveators—* the rule of law being that every man is presumed to be sane until it is proved that he is otherwise. *Tyson, et al. vs. Tyson's Ex'rs*, 37 *Md.*, 582; *Higgins vs. Carlton*, 28 *Md.*, 141, 142.

The appellants do not claim that the testator was a *maniac*, that he was habitually insane.; the extent of their claim is that he was *partially* insane—that he was laboring under *suicidal mania*, and their own witness, Dr. Morris, testifies that this is a special form of insanity, and that it may exist among people whose *intellectual faculties are in other respects unimpaired.*

In law, the absence or presence of *delusion*, is the true and only test or criterion of absent or present insanity; and in order to invalidate the will of a person laboring under a *delusion, it must appear that the will is the direct offspring of the delusion;* that the delusion influenced the testator in the manner of the distribution of his property; in other words, that the will, *by reason of the delusion*, was different from that which it would have been, had the delusion not existed.   Even admitting that the testator had suicidal mania, it does not appear that that had any effect on his mind in the disposition of his property.  1 *Jarman on Wills*, 56, *note* 7 ; *Dew vs. Clark*, 3 *Addams*, 79, (2 *Eng. Eccl. Rep.*, 441, 442, 497 ;) *Taylor's Med., Jurispd.*, 630, 655, 656, (5*th Amer. Edit.*;) *Dunham's Appeal*, 27 *Conn.*, 192, 201, 202, 203 ; *Duffield vs. Morris, Ex'r*, 2 *Harrington*, 375, 379, 380, 384 ; 1 *Redfield on Wills*, 85.

It is not sufficient *even to shift the burden of proof*, much less to establish the invalidity of this will, for the caveators to show that; *about a month prior to the execution of the will*, the testator was in such a state of delirium, produced by intoxication, as to incapacitate him at that time from executing a will.   He had so far recovered, as that, on the 9th of March, his *mind was clear*, and the evidence does not even show, that at any time from the 1st of March, down to the very instant of his death, the testator did not possess that degree of testamentary capacity requisite to the making of a valid will.  1 *Redfield, pages* 91, 92, 93 ; *Taylor's Med. Jurispd.*; 632, (5*th Amer. Edit.*;) *Duffield vs. Morris' Ex'rs*, 2 *Harrington*, 384 ; *Brooke vs. Townshend*, 7 *Gill*, 31.

It is not contended that a man is, under any circumstances, *justified* in taking his own life, but that a person, in the full enjoyment of his reason, may be so pressed upon by influences, from within and from without, that he would, while a sane man, destroy himself. *Taylor's Med. Jurspd.*, 677, 681, (*5th Amer. Edit.*;) *Ray's Med. Jurspd.*, secs. 386, 397, 398, 399 ; *Burrows vs. Burrows*, 1 *Haggard*, 109, (3 *Eng. E. Rep.*;) *Duffield vs. Morris' Ex'rs*, 2 *Harrington*, 382, 383, 384 ; *Terry vs. Insurance Co.*, 1 *Dillon C. C. Rep.*, 403 ; *Nimick vs. Insurance Co.*, 10 *Amer. L. Reg.*, *N. S.*, 101.

ROBINSON, J., delivered the opinion of the Court.

The sole question in this appeal, is whether the testator was of " *sound and disposing mind and capable of executing a valid deed or contract,*" at the time of the execution of the paper purporting to be his last will and testament?

This paper was executed in the forenoon of Saturday, April 3rd, and in the afternoon of the next day the testator died *by his own hands*. Continuing insanity on the part of the testator is not alleged, but it is insisted on the part of the appellants, caveators below, that at the time of the execution of the paper purporting to be his will, the testator was laboring under what is termed *suicidal mania ;* and that his mind was so disordered as to incapacitate him for making a valid will.

With all the lights which the researches of modern inquiries have elicited in regard to the condition of the mind, even in decided cases of monomania or delusion, it is always a delicate and difficult question to determine in such cases, the precise condition of the other mental faculties ; or to ascertain with any degree of certainty to what extent they may be implicated in the disorder.

By some writers, suicidal mania is regarded in all cases and under all circumstances, a positive sign or symptom of insanity. This view however is not sustained by the

most eminent writers on the subject, and certainly not by the weight of judicial authority.

Cases may, and do often occur, in which this disorder so affects the mental faculties as to make the party incompetent to execute a will or valid contract; while on the other hand it is obvious, that it may exist, and persons may under its influence, commit suicide, and yet possess their testamentary capacity unimpaired.

Where the act of self-destruction occurs immediately after the execution of a will, it may justly be regarded as a fact tending to establish a disordered condition of the mind, and the existence of some morbid affection tending to the derangement of reason; and a will executed under such circumstances should beget the greatest watchfulness on the part of the Court and the jury. But strange and unaccountable as the phenomenon may appear to most persons, the act of self-destruction cannot be judicially regarded as proof *per se* of insanity. After all it is but a fact, together with all other facts in the case from which the Court or jury are to determine the testamentary capacity of the testator, not at the time of committing suicide, but at the time of the execution of the will in question.

In all cases it is true, the testator must be of sound and disposing mind, but the question of "sound" or "unsound mind," must at last depend upon the facts and circumstances of each particular case.

Where a testator freely understands the nature of the business in which he is engaged, and has sufficient capacity to make a disposition of his estate with judgment and understanding in reference to the amount and situation, and the relative claims of different persons who are or who should be the objects of his bounty, this Court has repeatedly held that in such cases the testator is to be considered of sound and disposing mind within the meaning of the statute. *Davis vs. Calvert*, 5 *G. & J.*, 302; *Colvin*

*vs. Warford, et al.*, 20 *Md.*, 355; *Higgins, et al. vs. Coulton*, 28 *Md.*, 115.

With these well established principles to guide us, we now come to the facts in the record before us, upon which the testamentary capacity of the testator is sought to be impeached.

The testator was a police officer in the City of Baltimore, and addicted to the habit of indulging occasionally, to excess in the use of intoxicating drinks. To Mistress Habbersett, with whom he boarded, he admitted this propensity to be so strong, as to amount to a disease, against which he was continually struggling, and which at times he was unable to resist. So early as the middle of February, six weeks at least prior to the execution of the will in question, he began to drink, and continued to drink to excess until the seventh of March, at which time with all the approaching symptoms of *mania a potu*, he was taken to the Mount Hope Hospital. He was laboring at that time, says Doctor Stokes, the physician to the hospital, under the usual physical effects of hard drinking, vomiting, and very nervous, but that his *mind was clear*. Here he remained until March 13th, just one week, and although much better, he was still suffering from nervous prostration.

On the 20th of the same month he resumed his duties as police officer, but in a few days was obliged to report himself unfit for duty. He was still weak and nervous, and seemed to feel keenly his situation, said the merchants on his beat would shake hands with him, and tell him not to drink any more, and that even the negroes wanted to know where he had been. In the meantime, he was summoned before the Police Board to answer charges preferred against him for drunkenness, and although not dismissed he was publicly reprimanded before his squad. These circumstances tended still more to depress him—he complained of being unwell—remained in his room—seemed to be very nervous—said he did'nt care to remain

in the Police force, but could not bear the idea of being discharged for drunkenness—in fact his condition and conduct was such as to excite the apprehensions of Mistress Habbersett, with whom he boarded, and also officer Riley, that he intended to commit suicide.

On Wednesday the 21st of March he sent for Doctor Allan Smith, who came the next day, and prescribed a solution of bromide of potassium, a medicine administered to soothe the nervous system.

On Friday morning April 2nd, witness Veasel, a member of the relief committee of the George Washington Lodge, No. 13, Knights of Pythias, called to see the testator for the purpose of paying him certain benefits, to which as a sick member of the Lodge he was entitled. These benefits, the testator refused to take, and requested they should be donated to the Lodge, for the benefit of the widow and orphans' fund. As witness was about to leave the room, the testator told him he wanted to see some members of the Lodge, and after some further conversation, said "I have a little money in the Savings Bank, and I want to give it to the Lodge," witness then asked if there was no one besides the Lodge to whom he desired to leave the money, he said "no;" and in answer to the further question, "whether some one else would not fall heir to it, if the money was not left to the Lodge," he replied, "yes, but I want to fix it so that the Lodge can get it if anything should happen to me."

It thus appears, the first suggestion in regard to a will came from the testator, and when the witness intimated the propriety of leaving the property to others, the answer of the testator shows that he had fully made up his mind at that time, to give it to the Lodge. This purpose was expressed in the most decided manner, and so far as this interview is concerned, there is nothing certainly, from which the conclusion of testamentary incapacity can be drawn.

In consequence of the request thus made of the witness, Messrs. Lewis, Wells and Freish, members of the Lodge called to see him on the evening of the same day, April 2nd. After some general conversation about the weather, Lewis asked him what he wanted with them, to which he replied, I have a little money in the Savings Bank, and I want to leave it to George Washington Lodge. He then requested Lewis to go for a magistrate, suggesting Mr. Hayes who lived in the neighborhood ; not being able to find the magistrate, Lewis returned, and asked the testator if the next day would not do, to which he replied, " I suppose so." After some general conversation upon the topics of the day, in which the testator participated, the parties left, with the understanding they were to return next morning.

The testimony of Wells relative to this interview is substantially the same as that of Lewis, with the addition of some conversation which took place during Lewis' absence, about the success of the Lodge.

Freish, the other witness who was present at this interview of April 2nd, says, the question was asked, whether he had any relatives, to which the testator replied, that he had buried his father and mother in 1858, that he had brothers and sisters, but he did not care about leaving them anything, and that he had made up his mind three years ago to leave what he had to the Lodge. The witnesses Wells and Lewis had known the testator intimately for three or four years, and they both testify they saw nothing peculiar in his conduct, nor did they notice anything about the expression of his eyes or countenance, different from what they had been accustomed to see in him.

The next interview with the testator took place according to appointment on Saturday morning April 3rd, and lasted from 9 until 12 o'clock. Lewis testifies that after some conversation, Mr. Wells, at the testator's request, went for the magistrate, and during his absence, witness

again asked the testator if he had not some one else to leave his money to besides the Lodge; if he had not a father or mother alive? testator replied "no," *I buried them* in 1858.  Witness then said, have you no brother or sister, he replied "yes, but I don't want to leave it to them, I am not on good terms with them—if I leave it to George Washington Lodge, it will be taken good care of."

Wells returned and said the magistrate would be there in a few minutes.  In the meantime a general conversation took place, topics of the day discussed — allusion was made to a wagon belonging to witness Wells, and which was run over by the cars some time before in Pratt Street— the testator saw the accident, and described how in such cases the fault was generally with the driver of the wagon. In the midst of the conversation, testator saw the magistrate on the opposite side of the street, and said, " there is Bob now, go down and let him in."  The magistrate came up stairs and after the usual salutations, asked the testator what he wanted with him, to which he replied, " I want you to write my will, and said he had some money in the Baltimore Savings Institution, which he desired to leave to George Washington Lodge, No. 13, Knights of Pythias." The magistrate then asked him how much he had, he said I don't know exactly, I will get my bank book, he sat down, added up his bank book and said, I have $3560.

The will was then drawn by the magistrate, and read by him to the testator, and then read by the testator himself.  The initial letter "*R*" of the testator's middle name was left out, and this the testator noticed and directed it to be inserted in its proper place.  After its execution, the will was folded and endorsed by the magistrate, and then handed by him to the testator, who again observed that the letter R. was left out in the endorsement, and which was again inserted at his request.  The testator then asked the magistrate how much he charged for his services, and directed Mistress Habbersett to pay the

same. He then delivered the will to Lewis, and directed him to have it recorded.

During the whole of this interview, lasting more than three hours, the parties present saw nothing either in the manner or conduct of the testator to excite the slightest suspicion in regard to his sanity,—on the contrary, they all say, that in their opinion, he was of sound and disposing mind, and capable of executing a valid deed or contract. In addition to this, Mistress Habbersett who had watched over him during his sickness, and Doctor Theobald who called to see him professionally on the day the will was executed, both testify that he was fully competent to make a will.

If the case rested here, and the burden of proof was upon the caveatees, and not where the law places it, upon the caveators, no doubt we think could be entertained, in regard to the testamentary capacity of the testator. The proof shows, that the will was *his free and voluntary* act, that he *fully understood the nature of the business in which he was engaged — that he had sufficient capacity to make a disposition of his property with judgment and understanding*, both in reference to the amount involved, and the relative claims of different persons, who were or should have been the objects of his bounty.

Against testimony so strong and conclusive, we have the fact, that for sometime before the execution of the will, the testator had been drinking to excess—that after his return from Mount Hope Asylum, he was still weak and nervous, and out of health—that he was depressed in spirits, and disposed to take a gloomy view of affairs— that the day preceding the execution of the will, he was at times flighty, which he attributed to the medicine prescribed by Doctor Smith, that his conduct and manner were such, as to excite the suspicion of both Mistress Habbersett and officer Riley, of an intention to commit suicide.

In addition to this, we have the intelligent testimony of Doctor Morris, who was called to see him on Sunday, the day after the execution of the will, and the day on which the suicide was committed, and who after a careful examination of his symptoms, and observation of his conduct, came to the conclusion he was laboring under *"suicidal mania."* The Doctor however says, he seemed rational, and that this form of mania may exist, without impairing the other mental faculties. Be that as it may, whatever doubt the testimony thus offered on the part of the caveators might excite if considered alone, yet when weighed with the proof on the part of the caveatees, we feel obliged to say, that it fails to establish such a want of testamentary capacity, as would justify us in pronouncing against this will.

*Decree affirmed.*

(Decided 21st January, 1876.)