## ORPHANS' COURT OF BALTIMORE CITY.

Filed August 30, 1901.

IN RE. THE ESTATE OF SARAH A. C. SEAVER, DECEASED.

*George R. Willis* and *Joseph C. France* for caveators.

*Wm. Pinkney Whyte* for caveatees.

SAVAGE, C. J., BLOCK, J., concurring, and O'BRIEN, J., dissenting.

The interesting questions of fact and law which have been presented in this case for our consideration, decision and order have arisen in connection with the trial of a caveat filed in this court on June 27, 1900, to the last will and testament of Sarah A. C. Seaver, spinster, who died in this city, April 11, 1900, in the 84th year of her age. The testamentary instrument in controversy was written and executed on December 5, 1898, and was duly proved and admitted by us to probate on April 17, 1900, without objection, and letters testamentary were on that day granted to James W. Denny and William L. Lyon, the executors therein named.

By agreement the caveat was tried in this court, with the right to appeal reserved.

It was filed by Chas. L. Davis, Gilbert A. Davis, Samuel S. Davis and Sarah Ann Gordon, "first cousins" and "next of kin" of Miss Seaver. It contains the usual allegations of undue influence, fraud and testamentary incapacity. The caveators elicited no testimony sufficient in any view to show undue influence or actual or constructive fraud, and those charges were not argued. We are, therefore, limited in our inquiry to the testimony, evidence and law affecting solely the testamentary capacity of Miss Seaver at the time of the execution of the paper writing. They are of exceptional interest.

It was not suggested that the will of Miss Seaver bore in any respect intrinsic evidence of a want of testamentary capacity, and all questions regarding the meaning of its language or the consistency of its provisions are admittedly eliminated. After directing the payment of her debts and funeral expenses she disposed of her estate as follows: To Maggie Burford, $100; to Alverda Fullerton Schumacker, Isabella Fullerton and Garafilia C. Lyon, $250 each; to Wilhelmina Friedly, $250; to St. Mary's Catholic Orphan Asylum, the Protestant Orphan Asylum on Stricker street, and the Confederate Home, at Pikesville, Md., $250 each; and to Wm. L. Lyon a picture of George Washington; and after directing her executors to have suit-

able tombstones placed at the graves of her mother, sister and brother and at her grave, she gave the residue of her estate to her "dear friends, Alverda Fullerton Schumacker, Isabella Fullerton, Garafilia C. Lyon and Wilhelmina Friedly, share and share alike. absolutely and forever." The two first named residuary legatees are granddaughters of the late John Berryman (of whom we will later speak); the second is his only surviving child, and Miss Friedly was for more than six years her constant and most faithful companion and nurse. The subscribing witnesses are Edward R. Schumacker, T. Yates Walsh and Geo. G. Smith.

It is of the first importance to ascertain the tests and standards prescribed by law as to the mental requisites of testamentary capacity. The statute law of Maryland (Code, Article 93, Section 309), declares: "No will, testament or codicil shall be good and effectual for any purpose whatsoever unless the person making the same be at the time of executing or acknowledging it as hereafter directed, of sound and disposing mind and capable of executing a valid deed or contract." We will next cite the Maryland decisions which enlighten us as to the meaning of the above quoted statute.

We find in Higgins vs. Carlton, 28 Md. 115, the following explanatory language: "The testamentary capacity required by the law of this State is that the testator 'shall be of sound and disposing mind and capable of executing a valid deed or contract;' that is, he must have sufficient capacity, at the time of executing his will, to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property, and the relative claims of the different persons who should be the objects of his bounty." And the court added, guardedly: "But under this rule a jury is not required to reject a will because in their opinion its provisions are unjust and injudicious, but they may be considered by the jury in determining the capacity of the testator." The above was affirmed in Moore vs. McDonald, 68 Md. 321.

In McElwee vs. Ferguson, 43 Md. 478, the court said: "Where a testator freely understands the nature of the business in which he is engaged, and has sufficient capacity to make a disposition of his estate with judgment

and understanding in reference to its amount and situation and the relative claims of different persons who are or who should be the objects of his bounty, this court has repeatedly held that in such cases the testator is to be considered of sound and disposing mind within the meaning of the statute. Davis vs. Calvert, 5 G. & J. 302; Colvin vs. Warford, 20 Md. 355; Higgins vs. Carlton, 28 Md. 115."

In Brown vs. Ward, 53 Md. 375, the court declared that "sanity and mental capacity are presumed in law, and this presumption exists as well in reference to last wills and testaments as to other matters. The burden of proof rests as a consequence upon those who allege the contrary. Higgins vs. Carlton, 28 Md. 141; Tyson vs. Tyson, 37 Md. 582," and added:

"An alleged unsoundness of mind of a testator must be shown to exist at the time of the execution of the will."

Continuing, the Court gave this interpretation: "Sound and disposing mind and capable of executing a valid deed or contract in respect to making a will is that she understood the nature of the business she was engaged in, recollected the property she meant to dispose of, and the persons to whom she meant to give it, and understood the manner in which she disposed of it, and the relative claims of the different persons who are or might be the objects of her bounty. The definition given is that which has been recognized by the decisions of this court in Davis vs. Calvert, 5 G. & J. 301; Higgins vs. Carlton, 28 Md. 115; McElwee vs. Ferguson, 43 Md. 479."

The reported decisions in other States are instructive, and in Hall vs. Perry, 87 Maine, 569, occurs the following:

"To establish a will contested on the ground of the want of testamentary capacity, it must appear that the testatrix was a person of sound and disposing mind; and that she had mental capacity sufficient to enable her to understand the business in which she was engaged. A disposing mind involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds. It exists when the testator can recall

the general nature, condition and extent of his property, and his relations to those to whom he gives as well as to those from whom he withholds his bounty. There must be active memory enough to bring to mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them and form some rational judgment in relation to them.

But mere intellectual feebleness must be distinguished from unsoundness of mind. A person may be incapacitated by age and failing memory from engaging in complex and intricate business, and yet be able to give simple directions for the disposition of property by will."

In Leech vs. Leech, 21 Penn., 68, is this pertinent language: "There are few subjects coming before Courts of law that ought to be better understood by the general community than what is meant in our Courts by the phrase 'testamentary capacity.' And yet there are none in which the public are more in error. The prevalent idea is that in order to constitute 'testamentary capacity' the intellect of a testator should be in the most perfect state of integrity and possess all its original force and vigor. This, however, is an erroneous view of the subject. If such were the requirements of law few wills would stand a test so severe. A superstitious dread of executing such instruments, or a timid fear that such execution may be the immediate precursor of death lead to postponement and delays, and it continually happens that the final disposition of a man's estate, by his last will, is the last act of his life. One who is enfeebled and exhausted by the pains and sufferings of a mortal disease, and whose mind is agitated by hopes and fears of eternity, can hardly· be said to have his intellect in a perfect state of integrity. And yet a large portion of wills are made under such circumstances and are every day sustained in Courts of justice."

"It requires less capacity to make a will than it does to make a deed." (Kerr vs. Lunsford, 31 W. Va. Reports 659). The correctness of that proposition is obvious, and in this connection we quote from Kimball vs. Cuddy, 117 Ill. 213:

"To set aside a deed on the ground of the mental weakness of the grantor it is necessary to show such a degree of mental weakness as to render him incapable of understanding and protecting his own interests. The mere fact that his mental faculties have been somewhat impaired by age or disease is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his acts unless by reason of undue influence of the grantee he is unable to exercise his will in that respect."

We will add the following extract from Kerr vs. Lunsford, supra:

"It is not necessary that a person should possess the highest qualities of mind in order to make a will, nor that he should have the same strength of mind he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric and he may even want capacity to transact many of the ordinary business affairs of life; it is sufficient if he have mind enough to understand the nature of the business in which he is engaged, to recollect the property which he means to dispose of, the objects of his bounty and the manner in which he wishes to distribute it among them."

The law rightly and wisely throws its protecting arms around wills executed by the aged. Chancellor Kent pathetically wrote:

"It is one of the painful consequences of extreme old age, that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attentions due his infirmities." Van Alst vs. Hunter, 5 Johns, ch. 148.

And our Court of Appeals said in Higgins vs. Carlton, supra: "Neither age, nor sickness, nor extreme distress, nor debility of body will disqualify a person from making a will if sufficient intelligence remain," and in Hall vs. Perry, 87 Maine, supra, this language is used:

"Great age may raise a doubt of capacity so far as to excite the vigilance of the Court, but it does not alone constitute testamentary dis-

qualification. On the contrary, as stated in Maverick vs. Reynolds, 2 Bradf. Sur. Rep., 360, "it calls for protection and aid to further its wishes when a mind capable of acting rationally and a memory sufficient in essentials are shown to have existed, and the last will is in consonance with definite and long settled intentions, is not unreasonable in its provisions, and has been executed with fairness."

Before proceeding to gather from the voluminous stenographically reported and typewritten testimony in this case the controlling facts as to Miss Seaver's testamentary capacity on December 5, 1898, we will notice an incident of the trial. We were asked by the caveators to take judicial notice of a paper writing, dated May, 1898, and purporting to be a will of Miss Seaver, and by which she gave the residue of her estate to the caveators after making money bequests to the legatees named in her last will. The caveators, when challenged, refused to offer it as a will and it was ruled out, the caveators reserving an exception. The caveators then offered another paper writing, dated in 1897, not as a will but for the information of the Court. It was also ruled out, and the caveators again excepted. We attach little importance to papers of the character of those thus offered. They throw at best a dubious light on subsequent and validly executed wills. If it was designed to show merely a prior state of mind they are, standing alone, of small value, and even an absolute change of the residuary clause is no proof of testamentary incapacity. In the important case of The Safe Deposit and Trust Company of Baltimore, executor of George R. Berry, vs. Louisa C. E. Berry, et al., our Court of Appeals in its unanimous opinion filed June 12, 1901, and and reported in The Daily Record on June 22, 1901, said:

"A man may change his intentions with respect to the disposition of his property without changing his relations or feelings towards the collateral kindred to whom he previously proposed to give some of that property. His relations towards those persons may remain precisely as they had formerly been, and yet other considerations may induce him to make an entirely different disposition of his property. Unless it be assumed as a postulate, true without exception, that a change of intention as to testamentary disposals of property when there has been no change in one's relation towards another is essentially indicative of a loss of memory and consequently of impaired mental power, and of itself excludes every other explanation, there can be no rational inference drawn from such a circumstance that there was lack of testamentary capacity."

Having sufficiently set forth the law by which we must be guided in considering the character and degree of the mental powers of the testatrix, we must now find from the testimony, first, her general condition of mind, and, secondly, proofs of the possession and the free and adequate exercise on December 5, 1898, of requisite testamentary capacity. The testimony given in our hearing and the letters of Miss Seaver which were introduced in evidence furnished abundant proof that she was a woman of more than average vigor of mind, culture, courtesy and taste; that she was strictly honest and economical; not unsocial but uncommunicative about her family and pecuniary affairs; devotedly attached to her sister and brother; appreciative and loyal in her friendships, and of a retiring disposition. Her family and personal history was a sad one. In 1820 her father was murdered between Washington and Alexandria. He was then in business in Washington, D. C. She was then in her seventh year. Fortunately the Seaver family was well known to the late Mr. John Berryman, of this city, and he promptly and generously offered them an asylum in his home in Baltimore, which they accepted. The widow engaged in the millinery business and was helped by Mr. Berryman. The Seaver and Berryman families thus naturally became intimate and endeared to each other; the Berryman children and grandchildren were taught to regard Miss Seaver as a relative and always addressed her as "Cousin Sarah." After the remarriage of their mother, Martha and Sarah Seaver, both unmarried, lived in a house purchased for them by their brother, and were very affectionate. Their only brother, Wm. R. Seaver, removed to New York City and was successful in business. He never

married. He was a devoted, generous and self-sacrificing brother. His sisters loved him and had entire confidence in his judgment. At the time of his death, intestate, in 1896, he resided in Newark, N. J. Sarah Seaver was his sole heir, Martha Seaver having died in 1889.

There was no indication in any way of mental weakness of the testatrix until after the death of her brother in 1896, which event greatly distressed and depressed her. She was then in her 79th year, and was suffering from a painful but not dangerous cutaneous disease. No attempt was made to prove that her mind was impaired by her then or fatal malady. The changed condition of her mind was evidenced, according to the testimony and her letters, after her brother's death, and then by the delusions (which we will later consider), forgetfulness and inattention to dress. There was no proof of inability to attend to her ordinary business and household affairs, or to comprehend the meaning, scope and effect of her business transactions. The opinions of the witnesses called by the caveators, were founded, in most instances, upon brief and infrequent observations and casual conversations upon other than her business matters, Dr. Morris Weiner, (now in his 92nd year, and a living contradiction of want of testamentary capacity, because of venerable age), who attended her for more than thirty years expressed the opinion, based on her delusions, that her mind was in 1898 "unsound," but he stated, on cross-examination, that she was "very acute so far as money was concerned," and was, in his opinion, "able to buy and sell."

We are not without information as to the mental powers of the testatrix after December 5th, 1898. It is to be found in the testimony of four specially competent, unprejudiced and unbiased witnesses. Dr. Robert K. Kneass testified that he attended her professionally repeatedly in August and September, 1899; and that her replies to his questions were "always intelligent and always proper;" and he added: "After prescribing for her occasionally I sat with her, because I thought she was a very intelligent old lady; she was very courteous and very polite indeed, and I thought she

was a lady of unusual intelligence. What impressed me most—more than anything else—was the care with which she selected her words: she was very careful." He expressed the opinion, founded on his conversations with her, his attendance on her as her physician and her answers to his inquiries, that she was "perfectly competent" to make a valid deed or contract, and said he would have "felt justified in making a contract with her." Dr. John Hood saw her once on December 28, 1899, and testified: "Miss Seaver met me at the door and admitted me; she stated that the lady who usually was with her had just gone out; she gave me a very cordial and pleasant welcome, and asked me to take a seat in the parlor; I conversed with her ten or fifteen minutes; she asked me, or she remembered, that I lived on Fayette Street, near Calhoun street, at one time—15 years prior to my visit to her; she asked me about my family, and especially about the death of my son in Florida; she conversed intelligently and seemed to be in good spirits, and I noticed nothing in the impairment of her faculties except her memory; things that occurred several years ago she remembered very well, and facts of recent date she seemed to forget: she asked me the same question over three or four times; frequently in regard to recent events; that was the only defect I noticed in her mental condition."

William Kyper, a merchant, had business transactions with her for thirteen or fourteen years in collecting several ground rents payable by her, sold her small bills, and saw her last in September, 1899. Sometimes she paid at his store the amounts of the ground rents; at other times he called on her for them. The last payment made in September, 1899, was by a check drawn by him and signed by her. She offered to give him her deposit book on the Hopkins Place Savings Bank and told him he would need it in order to cash her check. He did not think he would need her deposit book and declined it, but he found on application for payment that she was correct in her recollection of the bank's rules. She also recalled on his return four or five days later that another ground rent would be due in a few days, offered to pay it and did so by

check. On cross-examination he said, in reference to the last payments of ground rents: "She was asking me about the time when the ground rents would be due, and it seemed that I could not impress it on her mind, and after talking then she would come back and ask me when it was; then I had to tell her three or four times when it was to impress it on her mind, but when I returned the second time she remembered it and suggested paying it when it was not due for probably three or four days." Mr. Kyper was of the opinion that she was mentally capable of executing a valid deed or contract.

Elmer Knatz, a grocer, sold her groceries at his store for several years and she personally made purchases of him three or four months prior to her death. She always knew what she wanted, paid for what she bought, and appeared satisfied. He observed nothing about her at any time to lead him to suppose that she was not perfectly competent to do any business.

The testimony as to the state of her mind just prior to and at the time of the execution of the caveated will and in direct connection with it is especially important. We will consider first what may be called the antecedent history of that disputed instrument, and, secondly, the immediate circumstances and facts which attended its execution. It should be borne in mind that Miss Seaver had continued uninterruptedly from her tender childhood her relations of friendship, gratitude and confidence with the children and descendants of John Berryman, her family's protector and benefactor, and had expressed her friendship for them and her preference for them rather than her "next of kin." The only witness as to her wishes expressed prior to the execution of her will of December 5, 1898, and in reference thereto, was Mrs. Garafilia C. Lyon, the sole surviving child of John Berryman, and the wife of Wm. L. Lyon, one of the executors. She had known the testatrix for more than fifty years, had always called her "cousin Sarah," had visited her frequently, had been shown special marks of her confidence and friendship, and was on such terms of mutual friendship that she could advise her without offense about her private affairs; and Miss Seaver's manner and conduct towards her had always been, Mrs. Lyon said, "most affectionate." Mrs. Lyon testified that in the latter part of November, 1898, she visited Miss Seaver at her home, No. 12 North Calhoun street, in this city, and that without any suggestion from her about a will, the testatrix informed her that she had made a will, and we give below the further testimony of Mrs. Lyon:" I said, "Well cousin Sarah, I am glad of it." "But," she said, "it worries me very much." I said, "in what way?" She said, "I have expressed in the will what my brother did not want me to do." I said, "what was that?" she said, "he expressly told me that he did not want a relative that he had to have a dollar of his money; he had not seen them for thirty years." And I said, "Well, then, Cousin Sarah, what are you going to do?" and she said: "Mr. Lyon promised me at my brother's grave, or at least he offered at my brother's grave, to do anything for me that I would ask him." "Now," she said, "do you think he could get me a good lawyer?" I said: "He will get you his lawyer, Mr. Denny, in whom he has every confidence, or one as good as Mr. Denny. What time do you want him?" She said: "Just as soon as you can get him." I said: "Cousin Sarah, do you want him in the afternoon or at night?" She said: "I prefer him in the afternoon, because Miss Friedly will be out at that time." I said: "Then you don't want Miss Friedly present?" She said: "No, I don't; she talks a little too much." "Well, then," I said, "Cousin Sarah, what time or what day will you have Mr. Lyon and Mr. Denny to come to you?" She said: "Arrange it with them." "Well, then," I said, "I will let you know." So I spoke to Mr. Lyon and he got Mr. Denny's time, and I went up and told her we would be there." We have thus given in full the testimony of Mrs. Lyon as to the voluntarily expressed wishes of Miss Seaver at that time, because it throws much light upon the whole matter before us. Her direct testimony was not, in our opinion, successfully impeached or contradicted by the testimony of other witnesses, who could only give their recollections of desultory talks with them by Miss Seaver, and not about those interviews or the subjects of them; and we have no difficulty in giving it due weight.

We come now to review all that occurred at Miss Seaver's home on the evening of December 5, 1898. She had been informed by Mrs. Lyon of the day and hour she was to attend to the execution of her will and had assented. The matter was in no sense a surprise to her. She did not, as far as the testimony disclosed, speak to anyone of her talks with Mrs. Lyon, the arranged visit or the contemplated act. Evidently she was determined, with characteristic reticence, to keep those matters to herself. It would needlessly encumber this opinion to give at length the testimony of the six witnesses who were present on that occasion, and we must summarize even its essential parts in the order in which it was given.

We do not consider it necessary to do more than refer to the proof of the factum of the will; it was sufficiently proved, and we have no doubt about it notwithstanding some unimportant contradictions.

The first witness examined was Edward R. Schumacker, an attesting witness, and the husband of Alberta Fullerton Schumacker. He had been called by Mr. Lyon from his nearby residence to witness the will. He had known Miss Seaver for about thirty years. He recalled that the will was read to her by Mr. Denny; that he questioned her on every point as he read it; that she agreed to everything it contained, and expressed herself afterwards as "very well satisfied" and "perfectly satisfied that she had made that will"; and that she was "remarkably bright that night." On cross-examination he said: "She said she had made one will before and she did not want to make any more; that one was satisfactory—further that it had been on her mind for some time and she was dissatisfied with the others." He did not modify his testimony on cross-examination.

George G. Smith, a druggist, who had been sent for to witness the will, remembered that Miss Seaver was asked before he signed if it was her last will and testament, and that she answered "Yes." He denied having made any remark at any time to T. Yates Walsh, the other attesting witness, about the will of Miss Seaver. His acquaintance with Miss Seaver was slight.

The testimony of the third attesting witness, T. Yates Walsh, was taken in Texas, on May 10, 1901. He appeared in this Court on April 17, 1900, and testified, as an attesting witness, that he had seen Miss Seaver sign and seal the paper writing as her last will and testament; that he had heard her declare it to be her last will and testament, and that he and the other witnesses had signed at her request, in her presence, and in the presence of each other. He further testified then that at the time she signed the will she was, to the best of his apprehension, of sound and disposing mind, memory and understanding. On cross-examination in Texas he gave only this statement as to his testimony in this Court: "The judge read a clause as to the soundness of her mind and I called his attention to the fact that I only witnessed her signature and did not know the contents of the paper." He also testified in Texas: "E. R. Schumacker and Wm. L. Lyon came to my house and asked me to witness a will of Miss Sarah Seaver; I went in with them and found Mrs. Lyon, Mr. Denny and Miss Seaver, I asked Miss Seaver if the will was what she wanted to do; she said she supposed so—that she had not read it; Mrs. Lyon said she had read it to her before I came in; I asked her if she wanted to change her will and she did not remember that she had made one. Mr. Denny asked if she would sign the paper, holding it out, and she got up and signed it. Mr. Schumacker and I witnessed it. Mr. Denny suggested having a third witness and said to Mr. Lyon that he would answer. Mr. Lyon objected, saying that his wife was a beneficiary. Mr. Lyon and Mr. Schumacker went out and brought in Geo. G. Smith. Miss Seaver acknowledged her signature. Mr. Smith witnessed it, and he remarked to me the next morning as I passed his drug store that she was no more competent to make a will than his showcase."

Mr. Walsh further testified that the morning after he witnessed the will Miss Seaver asked him what the paper was, said Mrs. Lyon had been coming to her house day after day and had gone through all her drawers and papers and taken some of them; said she could not help it and could not fight with her; also that Mrs. Lyon said she was going to bring her

husband and fix up her affairs; that Mr. and Mrs. Lyon and Mr. Denny, who was a stranger to her, came, got out paper and talked and wrote and told her she had made a will and she was very much surprised and wanted to know what was in it. Her memory was very weak at the time of making the will and continued to get more so up to the time of her death—I saw her every few days, sometimes daily—She could not remember whether she had money or not, or that her brother and sister were dead." "And yet when asked finally, on his examination in chief, to state 'in detail what, if anything, Miss Seaver said in his presence subsequent to the execution of the will of December 5, 1898, indicating her knowledge or lack of knowledge of that writing,' he testified: 'She said nothing but seemed to be worried by Mrs. Lyon coming and going through her papers.'"

Mr. Walsh failed on April 17, 1900, to give this Court any information of his alleged conversations with Miss Seaver at the time of the execution of the will and the day after and with Mr. Smith on the morning of December 6, 1898; he contradicted himself on his examination in chief, though testifying with the deliberation inseparable from the taking of his testimony under a commission; and there was no attempted confirmation of his reported recollections of Miss Seaver's statements to him on that night. The attorneys in the case ignored his testimony save to read it, and we must reject it as it is clearly unreliable.

The strongest testimony in reference to the execution of the will and Miss Seaver's mental powers at that time will now be considered. Three other witnesses, namely, Mrs. Lyon, Mr. Lyon and Mr. Denny were then present, having reached her home between 7 and 8 P. M., December 5, 1898, as agreed.

Mrs. Lyon testified that Miss Seaver informed Mr. Denny of her wishes, and that he wrote the will accordingly, read it to her, and asked her if it was her last will, and she said "Yes," and signed it in the presence of all the witnesses. She recalled that Miss Seaver, to her surprise, expressed a wish to leave her something, and that Mr. Denny thereupon told her it was for her to do as she pleased about it.

Continuing, she testified: "He waited and said: 'Miss Seaver, do you intend to leave Mrs. Lyon anything?' She said, 'Yes.' He said, 'Well, what will it be?' She said, 'Just the same as I left the others, $250.' And after the will was completed he said, 'Well, what will be done with the residue?' She said, 'I really don't know, Mr. Denny, that I will have any more than enough to pay the bequests.' 'Well,' he said, 'if there should be?' She said, 'Divide it up into four equal parts between Miss Friedly, Mrs. Schumacher, Miss Belle Fullerton and yourself, meaning me." She was positive in her recollection of those particulars. She was not interrogated as to the statements of Miss Seaver at the time, as given by Messrs. Schumacker and Walsh.

Mr. Lyon, who had known her fifty years, testified: "She came in the parlor and we four chatted a while in general conversation, of which I remember very little, except that Mr. Denny, looking around the room, spoke of some pretty pictures that were hanging on the walls, and she remarked: 'Yes, sir, most of those pictures I painted myself.' Mr. Denny got up and looked at one of them and she got up and told him what the subjects of the various pictures were. Some were, if I recollect right, of old castles, and there were several other pictures. In going around the room we came to a picture of George Washington, and I said to her: 'Cousin Sarah, you had better give me that picture. She laughed and said nothing. We finally took our seats at the table and then the will was written. Mr. Denny asked her what disposition she wanted to make of her property and she gave the names; if I recollect right, he commenced with, I am not positive about it, the Confederate Home, $250; she mentioned Mrs. Schumacker's name and $250; and Miss Fullerton's name, calling them by their first names; then she hesitated, and Mr. Denny said: "Well, who next?" She turned her hand on my wife's arm and hand, and said: "Selia, I would like to leave you something," and Mr. Denny remarked: "Well, Miss Seaver, it is yours to do with as you please." She then said: "Put Selia down or Mrs. Lyon for $250." Then she mentioned the Protestant Orphan Asylum on some street (I don't remember the street), for $250, and the St. Mary's Orphan Asylum for $250; when she mentioned

St. Mary's Orphan Asylum Mr. Denny said something, I don't remember his exact words, but the purport of them was: "You are quite liberal in your views to make no distinction in denominations and you leave to Catholics and Protestants alike." "Well," she said, "Mr. Denny, are they not all orphans?"

She left somebody $100 and I didn't know who it was; she named Miss Friedly for $250; Mr. Denny asked her what she proposed to do with the residue, and she said: "I don't know that I will have any; I don't know that I will have enough to pay what I have already mentioned; I have never had any statement or know anything at all of what I have got, and I don't know." "Well," he said, "there may be something and you had better provide for it; what shall it be?" She thought for some moments and said: "Oh, well, divide it up among the four, Selia, Allie, Miss Fullerton and Minnie Friedly." Mr. Lyon recalled having offered at her brother's funeral, in 1896, to serve her if she would call on him. He added that Miss Seaver had told him sometime previously that she had never had a statement from Mr. Albert T. Condit, who is a reputable attorney, of Newark, N. J., and who had acted for years as her bother's attorney, there and had settled his encumbered estate there, and that she said she did not know what she owned or what she had.

Continuing he said: "When Mr. Denny asked her who her executor should be, she said: 'Well, I would like Mr. Lyon to serve.' I said: 'No, Cousin Sarah, I don't want to serve; appoint someone else; I won't have time to attend to it, and I had rather you name someone else.' 'Well,' she said, 'I don't know; I have known you a great many years, and I had rather have you to serve than anybody else.' I leaned over and asked Mr. Denny if he would serve, and he said he would; and I said: 'Cousin Sarah, I will serve, provided you ask Mr. Denny; he can attend to the legal matters; in fact; attend to it all, and I will be with him.' She said: 'That ·is satisfactory.' He remembered also that she signed first, and that all the witnesses signed after her. He added: 'Miss Seaver was bright—as bright as a button—laughing and talking before we approached the will business.

When she came to the Confederate bequest she said: 'You know I was a great secessionist; I was a great Southern sympathizer.' "

When asked as to her testamentary capacity that night he said: "I would have taken a deed from her of her house or of any other property, and passed over the money to her; she was perfectly clear in every respect; she gave each item to Mr. Denny herself, and if you will look at the old will you will find they are almost identical with the previous will; the names and all are mentioned there, her mind was as clear as a bell that night. I know nothing further than that night, because I had not been there for two or three years."

The remaining witness was Mr. James W. Denny, and we feel constrained to give his testimony in chief almost in full. He said:

"We went to No. 12 North Calhoun street, near Baltimore, and walked into the parlor; a bright fire was burning and everything looked cheerful around; Miss Seaver met us and I was introduced to her; we sat down in the parlor and talked generally a little while, and I happened to notice some tasty pictures around the walls that looked like a cultivated person's; I began to walk around the room and look at them, and Mr. Lyon was with me; Mrs. Lyon and Miss Seaver were sitting talking by the fire; it was cold weather; presently she arose and joined us; she was a slight person and appeared to be active on her feet; she modestly said that the pictures that we were looking at were some of her earlier efforts as an amateur; we walked around and she pointed out maybe half a dozen, or a few at least, of the pictures which she herself had painted; we came to one of George Washington, to which Mr. Lyon took a fancy, and he said: 'Cousin Sarah, I would like to have that picture,' and she said, 'I will give it to you.' I said, 'Miss Seaver, I have come to draw your will at the suggestion of Mr. Lyon.' She said, 'Yes, I requested you to be sent for.' "

Then began our conversation about the business: I asked her a few questions about her estate, and she indicated that she had a few thousand dollars in a savings bank in Balti-

more, but that the condition of her estate, which she said was in the hands of Mr. Condit, a New Jersey lawyer, her brother's lawyer, she did not know exactly how it stood, but that she had received money from him from time to time, and that she thought she had some estate there, some considerable estate, but she could not tell, and she wanted me to look into that matter for her; and that she had made inquiries, but that it was not satisfactory; she was not getting from there what she ought to get; that was the result of the conference. She drew up a stand and I took my pen, ink and paper out of my bag, and I asked her to indicate what she wanted me to write.

In the same conversation she said that she had written a will, which was in the custody of her lawyer, Mr. Condit, or rather that he had written the will for her, and that she had signed it and given it to him some time before, and that it did not express her wishes, and that she had sent for me to make a will to express her wishes. She said in that conversation that she had given Dr. Weiner in the former will a legacy of $500, and that while she appreciated Dr. Weiner and meant to remember him, that since that time, she had, in her judgment, satisfied Dr. Weiner's claim, and that she did not propose to have Dr. Weiner participate in it. She said, "I have some distant cousins in Maine, or some other place (I don't know where she located them), who she had not seen for many years, and that when she was sick on previous occasions not one person had ever come, of her relations, to make the least inquiry about her, and in that will she had given those relations a part of her estate; and she said further that Minnie Friedly had been very devoted and faithful to her and she intended to increase her allowance which was $100; she remembered those things, and she wanted those things changed.

"I said, if you will be good enough to indicate to me how you want it drawn I will do it. I sat down by the table and I said to her: 'Well, to whom do you wish to give your property,' then she began to think and reason, and she said: 'I want Minnie Friedly to have a good portion; I want her to have $250; I have given her $100 in that other will.' I put her name down, and I said: 'Who else'; then she said:

The two Miss Fullertons, or one Miss Fullerton and Mrs. Schumacker who live around the corner;' she said they had been very kind to her, and she wanted them to have $250. I put that memorandum down too; and she said: 'Don't forget Mrs. Lyon; she has been an old friend of ours, and I want her to be remembered;' so I put her down; and then she mentioned the Confederate Home at Pikesville; that they were old soldiers, and did not have any pensions, and I put them down. And she had a young lady, somebody that I had never seen or heard of, Miss Burford or Beaufort, that she named. After she had named all those persons who are named in the will, the will was written by me then; and then I said to her: 'Well, you may have something in addition, Miss Seaver; what disposition will you make of the remainder of your estate? This is giving specific sums, and you may have something, and you may not. She could not tell me the condition of her estate in New Jersey. She mentioned some four or five people as her best friends, that she said they had been, and her conversation meant that she wanted to change her will in reference to her relations, who had never visited her on any occasion, and she said: 'You can give them the balance; share it among them;' so I put that in, and then we came to the question as to whom she wanted to make this distribution of her estate. I had learned that she held the house where she lived, or at least she said it was hers, but it was not in point of fact hers; it was her sister's; her sister had made a will giving it to her and the will was on record but the legal title was never in her name.

"I remember that she mentioned the two asylums she wanted to be remembered; she wanted the Protestant Orphan Asylum and the Catholic Orphan Asylum to receive a similar amount, and I made some suggestion at that time; I said I am very glad to see you so generous or liberal in your donations in that respect without regard to religious denominations; and it impressed itself upon my mind because she said 'Well, they are all orphans.' "

All the bequests were directed by her; and by nobody else in my presence, and I was not out of the room that evening until I left with Mr. and

Mrs. Lyon; nobody at that time made one single suggestion that I am aware of other than Mr. Lyon saying: "Cousin Sarah, I would like to have your George Washington," and before the memorandum that I was drawing was finished, she said: "Yes, don't forget George Washington for Mr. Lyon." I said to her: "Who will you have to be your executor, what person will you have to have charge of the making of the disposition of your property?" She said "Mr. Lyon." Mr. Lyon said: "Cousin Sarah, please excuse me, I don't understand that, I am a business man" or words to that effect, and she said: "Mr. Lyon, don't you remember telling me at my brother's grave that if I wanted a friend to call on you?" and Mr. Lyon said: "I do remember that, cousin Sarah"; Mr. Lyon said: "I will be one of them and I would suggest that you name Mr. Denny with me; I will serve then, because he can attend to the legal part; nobody else had ever suggested my name, except that Mr. Lyon suggested that I be made co-executor with him, because he did not want to serve," and she said: "That is all satisfactory to me."

After I had that memorandum put down, I then wrote the will, and after I had written the will, I read the will to her aloud in the presence of Mr. and Mrs. Lyon; I handed it to her to read it then and I think she read it herself.

Q. Every word of it?

A. Every word of it.

Q. Did you make any remark to her about whether or not she was satisfied or something of that sort; somebody has said something about that?

A. At the time of the execution of the paper I had explained to her that I had to have a few witnesses; Mr. and Mrs. Lyon would have witnessed the will, but when I found one of them executor and the other distributee, I thought it would be desirable to have some outside persons, and I suggested to Mr. Lyon to go out in the neighborhood and get a few witnesses; they were Mr. Walsh and the others that have testified in this case.

Two of them came in first and I said they had better get another one; the law says "two or more credible witnesses," and the third will make two of you "credible," in some pleasant manner; so they got those three witnesses and they came in, and I said: "When these gentlemen come in, Miss Sarah, you will have to acknowledge that this is your will in their presence, and I will ask you the question whether you have read this paper and understand its contents and whether you pronounce it to be your last will and testament, and if that is so you will say to them, yes; and then I will ask you further the question, do you request these people to witness it as such;" all three came in after a time and I propounded those questions, and Mrs. Lyon asked her whether she had read that paper and what she pronounced it to be; she said her last will and testament, and I said: "Do you request these three gentlemen here to witness it as such?" and she said, "Yes," and they all three signed it at the same time in the presence of Mr. Lyon and myself. In conversation I had a good deal of talk with her, because she did not appear to be satisfied with the condition of her property in New Jersey; she said her brother owned a good deal of property there and owned a farm and that her conferences with Mr. Condit indicated that the farm had been sold and mortgaged and all of that, and a good many papers had been sent to her to sign; I thought the old lady might possibly be in the hands of somebody that was not treating her honestly, and I suggested to her, that as Mr. Lyon was a good friend of hers and had been for years and had endorsed me, perhaps, you will give us authority to make the investigation as to where your property is, if you do not know anything about it. She said, "I will"; so I wrote that paper (a power of attorney) the same evening authorizing Mr. Lyon and me to look into her affairs at Short Hills, New Jersey; Mr. Lyon and I did so, to a certain extent, but to no serious extent; I want to a bureau of inquiry on Baltimore street, one of these investigating companies, and asked them to give me a report upon Mr. Condit of Newark, New Jersey, and they gave me an excellent report of him, stating that he was a lawyer of intelligence and responsibility, and I thought if that was the condition, that he was a responsible man, that I would not put the old lady's estate to any expense or herself, in making any further investigation."

When asked to state to the court, from what he saw of her and the conversation he had with her, the statements she made and the information which she gave him, whether or not she was, in his opinion, competent to execute a valid deed or contract at that time. He replied:

"She was, unquestionably."

"Have you any doubt about it?" he was asked, and he answered:

"I haven't the shadow of a doubt about it."

The above explicit, direct and positive testimony was not materially modified on cross-examination. It is conclusive as to the strength, activity and freedom of her mind at that time.

Two other phases of this case remain to be considered. Undoubtedly Miss Seaver had insane delusions in reference to her deceased sister and brother, and "the meaning of an insane delusion, in its legal sense, is the belief in things impossible, or the belief in things possible, but so improbable, under all the surrounding circumstances, that no man of sound mind could give them credence." Brown vs. Ward, supra. And in that well-known case the Court also said: "If such delusions were temporary and occasional, and not permanent and continuous, then the presumption of law is that when the will was made the mind of the said Jane Ray was free from the influence of such delusions unless the plaintiff shall satisfy them that such delusions controlled her mind at the time she executed her will."

It is appropriate to also quote from Brown vs. Ward, as follows: "The Court cannot say, as a matter of law, that a person is insane because he holds the belief that he can communicate with spirits, or can be, and is, advised by them in his business transactions and in the disposal of his property. Such beliefs do not themselves afford a certain test of insanity or want of testamentary capacity."

In Lee vs. Lee, 4 McCord, South Carolina Reports 183, it was held:

"The mind is presumed to be sound until the contrary is clearly proved, nor is it sufficient to show that the imagination of the testator was generally disturbed with a strange belief in witches, devils and evil spirits which he fancied continually worried him, and that he

lived in the strangest manner, wearing an extraordinary dress, sleeping in a hollow log, and exhibiting other extravagances, the man being able in other respects to manage his affairs."

The case of Rice vs. Rice, 53 Mich. 433, is in this connection, in point. The testator, Rice, had delusions respecting the currency, political affairs and his own candidacy for office, and that very able lawyer, the late Chief Judge Cooley, said, in his opinion: "The most strange and gross of them was that his services were needed by the general government in the management of its financial affairs and that he was likely to be made Secretary of the Treasury. Rice seems to have been a man of considerable prominence in his county, and the so-called delusions were not necessarily inconsistent with testamentary capacity, but indicated rather inordinate and ridiculous conceit than insanity. They did not at all enter into or affect the provisions of the will, which was a plain and sensible instrument, dividing the decedent's property among the members of his immediate family, and containing no provisions from which, as they read, insanity would be inferred or suspected."

It was proved that Miss Seaver, after the death of her brother in 1896, and after the execution of her will of December 5, 1898, cherished at times the delusion that he still lived, talked of him as still living and wrote letters to him as if he were still residing at Short Hills, N. J. It was also proved that she said, when his death and his funeral from her home were recalled to her, that of course, she knew he was dead. On the evening of December 5, 1898, and after the execution of her will she spoke to Mrs. Lyon of her brother as if he was living, and when remonstrated with she said: "Of course I know he is dead." She also spoke at times of her sister Martha as living and had meals intended for her sent to her room she had occupied.

The law we have quoted above, requires the caveators to satisfy the Court or jury that the insane delusions of which proof is offered were continuous, and operated upon and controlled the mind of the testatrix at the time of the execution of the will and in reference to its provisions. There was no such proof in the case under consideration. All that could be inferred from the proof of the insane delusions of

Miss Seaver was that her mind was unsound, but they were not shown to have operated upon and controlled her mind at any time in reference to the testamentary disposition of her estate. There was a failure to connect them with the will of December 5, 1898. They were apart from it, and "where it is shown that the testator was under an insane delusion his mental capacity is to be measured by the relation of the delusion to the testamentary act." Matter of Vedder, 6 Dem. (N. Y.) 92.

The other phase in question is Miss Seaver's alleged want of testamentary capacity as indicated by her remarks to Mr. and Mrs. Lyon, and to Mr. Denny on December 5, 1898, as to her lack of knowledge of the extent of the residue of her estate. We will quote the law. It is stated in Kerr vs. Lunsford, supra:

"It is not necessary to prove that the testator actually recollected all his property disposed of by his will, the objects of his bounty, the number of them, the advancements he claims to have made to them, and the manner in which he wished to distribute his property; if he was mentally capable of doing so it is sufficient. And it is settled that the question is as to actual capacity not before or after, but at the actual time of the execution of the will. Leech vs. Leech, 21 Penn. 69; Prentiss vs. Bates, 88 Mich. 567."

It was then incumbent upon the caveators to prove to our satisfaction that on December 5, 1898, the testatrix was mentally incapable of comprehending the extent, character and value of the residue of her estate. There was no proof to that effect. We cannot believe it from the language she used to the three witnesses named above. The burden of proof was on the caveators to establish, as against the legal presumption of sanity, their whole contention and especially in this connection her mental incapacity as to the residue of her estate. There was an ominous omission on the part of the caveators. Mr. Condit has knowledge derived from personal interviews and correspondence of the state of Miss Seaver's mind, and the extent and character of the information he had given her about her inherited property. He could have been brought before us, or his testimony could have been taken in New Jersey by the caveators and

read to us. We cannot conjecture as to the character or extent of his knowledge, or as to what information he gave Miss Seaver, and we must decide this case with his knowledge, and the information given by him to her, whatever it was, omitted by the caveators.

There was no proof of a purpose on the part of Miss Seaver to revoke her last will. She took no steps to revoke it. It must, therefore, stand unaffected in that particular.

The feelings of Miss Seaver towards the caveators had been expressed and repeated by her as herein stated, and they must in law rely solely upon their legal proof in support of their caveat. The law gives to sane testators absolute powers of disposition, if not inconsistent with its policy:

"Neither a deed nor a will can be impeached merely because of the injustice or impropriety of the provisions thereby made. If the maker is sane, he may, from caprice, cause less malice or foolish prejudice, cut off his children and give his property to strangers. The moral injustice or caprice may be considered only as a circumstance on the question of insanity, but it is not a controlling one, and if from other evidence it be clear the party was sane, it is of no moment whatever." Kimball vs. Cuddy, supra.

We have concluded, after a full hearing and argument and a very careful consideration of the facts and the law, that no attempt was made to unduly influence Miss Seaver or to practice a fraud on her; that when she executed her last will and testament she was possessed of sufficient testamentary capacity and understood and approved it; that all the legal formalities were observed; that her insane delusions in reference to her deceased sister and brother were not operative upon and did not enter into and control her mind in the making of her will; that her will is reasonable, consistent, and as she freely expressed her wishes to have it; and that she was mentally capable at the time of its execution of understanding the location, character, extent and value of the residue of her estate, and disposed of it with adequate knowledge of it.

We will, therefore, sign an order dismissing the caveat filed in this case, and directing that the costs be paid by the caveators.