# CHARLES L. DAVIS ET AL. *vs.* JAMES W. DENNY ET AL., EXECUTORS.

*Wills—Testamentary Capacity Defined—Evidence Held Sufficient to Show Incapacity to Make a Will—Conflicting Statements by Attesting Witness.*

Testamentary capacity consists in the possession by the testator, at the time of making his will, of a full understanding of the nature of the business in which he is engaged ; a recollection of the property of which he intends to dispose and the persons to whom he means to give it ; and also an understanding of the manner in which he in fact disposes of it, and of the relative claims of the different persons who are or should be the object of his bounty.

Upon a caveat to a will alleging want of testamentary capacity the evidence showed the following facts : The testatrix at the time of executing the will was about eighty-two years old and had survived her brother and two sisters and had no living relatives nearer than cousins. She owned the house in which she lived and had about $3,000 deposited in a savings bank. Upon the death of her brother two or three years before that she inherited from him a farm in New Jersey, which was sold by her agent in that State and she became entitled to a purchase-money mortgage for about $15,000, the interest on which was regularly paid to her. When her brother died, he was buried from her house and she was present at his funeral. Certain friends and neighbors of the testatrix testified that they thought her capable of executing a valid deed or contract, while others thought not. After the death of her brother and sister she frequently spoke of them as being alive. On some occasions she sent meals upstairs to her deceased sister, and less than three weeks before making her will wrote a long letter to her brother as if he were still alive. This was not the result of a persistent delusion but of a failure of memory, and when reminded that her brother or sister was dead she would reply that she remembered it. Her attending physician testified that she was not of sound mind when she made her will. Two of the attesting witnesses testified that in their opinion she was capable of making a valid deed while the third attesting witness was of the opinion that she was incapable and said that on the day after the execution of the will the testatrix told him she was surprised to learn that she had made a will and wanted to know what it contained. The lawyer who drew the will had not previously been acquainted with the testatrix and was taken to her residence at her request to draw the same. In reply to his inquiries the testatrix then said that her estate consisted of a few thousand dollars in bank, and she thought she had some property in

the hands of a New Jersey lawyer. She directed legacies amounting to about $1,800 to be given to certain friends. When asked what disposition should be made of the residue of her estate she replied: "I don't know that there will be more than enough to pay those bequests, but if there should be divide it into four equal parts between" four of the persons who had already received legacies. The will was then and there drawn according to these directions, and was signed and witnessed and handed to one of the legatees there present for safe keeping. A day or two afterwards, the testatrix wrote to this legatee asking that the paper be returned to her, and a few weeks afterwards she wrote to her agent in New Jersey asking if he had made any arrangement for the sale of the Jersey property and if any interest was coming to her, and saying that she had not heard from her brother for a long time. *Held,* that this evidence establishes the fact that the testatrix did not possess sufficient mental capacity to make a valid will.

An attesting witness made, when the will was probated, the usual affidavit as to the condition of the testatrix. Subsequently, upon a caveat, he testified that in his opinion the testatrix was not capable of executing a valid will. *Held,* that this conduct of the witness is proper to be considered in estimating the weight to be given to his evidence in the caveat proceeding, but the Court will not altogether reject his evidence, since in probating a will in common form the affidavit made by the witness is merely read to him and he is not questioned in detail as to the matters contained in it.

Appeal from the Orphans' Court of Baltimore City.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*George R. Willis* and *Joseph C. France* (with whom were *Francis T. Homer, Samuel K. Smith* and *John L. V. Murphy* on the brief), for the appellants.

*Wm. Pinkney Whyte* and *James W. Denny,* for the appellees.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of Baltimore City dismissing a caveat filed to the will of the late Sarah A. C. Seaver by the appellants who are her next of kin.

The petition of the caveators alleged fraud and undue influence in procuring the making of the will, and also a want of testamentary capacity on the part of the testatrix at the

time of its execution, together with an ignorance by her of its contents. Much testimony was taken in the case, but it will be necessary for the purposes of this opinion to refer only to that portion of it bearing upon the issue of the testamentary capacity of the testatrix at the time of making her will, as we do not think that the charges of fraud and undue influence made in the caveat are sustained by the evidence.

Having thus but the one issue to determine it will simplify the discussion to first state the law applicable to that issue. This Court has frequently been called upon to define the testamentary capacity which a testator is required to possess in order to make a valid will. Its decisions upon that subject have uniformily held, with slightly varying forms of expression, that such capacity consists in the possession by the testator at the time of making his will of a full understanding of the nature of the business in which he is engaged; a recollection of the property of which he intends to dispose and the persons to whom he means to give it; and also an understanding of the manner in which he in fact disposes of it, and of the relative claims of the different persons who are or should be the objects of his bounty. *Davis* v. *Calvert*, 5 G. & J. 301; *Colvin* v. *Warford*, 20 Md. 367, 388; *Higgins* v. *Carlton*, 28 Md. 125; *McElwee* v. *Ferguson*, 43 Md. 479; *Brown* v. *Ward*, 53 Md. 382.

Sanity and mental capacity are presumed by the law to exist in reference to making wills as well as to other transactions and the burden of proof is upon those who allege their non existence. *Brown* v. *Ward, supra*; *Higgins* v. *Carlton, supra*; *Tyson* v. *Tyson*, 37 Md. 582.

There is in the present case no suggestion of want of capacity on the face of the will. It is true it gives the entire estate to strangers and does not mention the relatives or next of kin of the testatrix, but the record shows that she had survived all of her immediate family and that her only relatives were in the collateral line and lived at locations remote from her and that she had seen none of them for more than twenty years and had rarely communicated with any of them by letter.

On the other hand it appears that one of her principal legatees had been her faithful nurse and companion, and three of the others were not only her friends and neighbors but were the descendants of a gentleman who had been a most generous benefactor of the testatrix and her family in a time of great distress.

Despite, however, the reasonable character of the provisions of the will itself, a careful examination of the evidence appearing in the record has led us to the conclusion that the mental power, and especially the memory of the testatrix, had become so enfeebled and impaired when she made her will that she had no adequate understanding of the business about which she was then engaged, or recollection of the property which she intended to dispose of, and was therefore not competent to make a valid will.

She was in her eighty-second year when she made her will and was the survivor of three children, one brother and two sisters, all of whom remained unmarried. Prior to 1868 the brother William, purchased a leasehold house, No. 12 N. Calhoun St. in Baltimore City as a home for his mother and two sisters, and they resided in it as long as they lived. The mother died in 1868, one sister, Martha, died in 1888, the brother died in 1896, and last of all the testatrix died in 1900. William, who resided near Newark, in New Jersey, sent to the testatrix as long as he lived a small weekly allowance for her support. She had originally no property of her own but she became entitled by way of distribution to the Calhoun St. house on the death of her mother and sister and brother, and she also received an estate worth about $15,000 from her brother at his death in 1896.

The property which she derived from her brother consisted of a farm in New Jersey which was subject to a mortgage. Mr. Condit, a lawyer residing in New Jersey, who had been the friend and legal adviser of the brother during his life and thereafter became the adviser and agent of the testatrix, sold the farm for her after her brother's death. On December 15th, 1897, about one year prior to the making by the testatrix of

her will, Mr. Condit wrote her a letter, which appears in the record, informing her that he had sold the farm to a Mr. Hartsorn for $40,000; for $21,000 of which Hartsorn had assumed the incumbrance already upon the property, and he had given a purchase-money mortgage for $15,000, and had paid the balance in cash. In the same letter Mr. Condit informed her that he would soon come to Baltimore and get her views as to the disposition to be made of the proceeds of sale. He came to Baltimore to see her before she made her will and brought her $3,000 in cash which she deposited in a Savings Bank, and a business correspondence was kept up between them until her death, he sending to her currently an income of $700 or $800 yielded by the unpaid balance of purchase-money for the farm, and she executing the deed conveying the farm to the purchaser. She must therefore have been fully informed as to the nature and extent of her property in New Jersey not long before she made her will, and she would have known exactly what it was when she executed that instrument if her mind had been vigorous enough to retain the information. After her death the balance then remaining due on the mortgage was collected by Condit and remitted to the appellees as executors, who received from that source the net amount of $10,000. It thus appears that at the time of making her will the testatrix owned the Calhoun St. house, which afterwards sold for $1,200, the $3,000 in the Savings Bank and a balance of at least $10,000 of the purchase money mortgage on the Jersey farm.

When William died his body was brought to Baltimore and buried from the Calhoun St. house, as that of the sister Martha had been, and the testatrix was present at the funerals of both the brother and sister. Thereafter she lived alone in the Calhoun St. house until her own death. A colored servant, Cephas Johnson, came daily to the house and attended to certain of her domestic wants, and a young woman, Minnie Friedley, always spent the night and part of the day with her. She was visited from time to time by her lady friends and up to the time of making her will she, although somewhat of a

recluse, went about the city occasionally on errands of business or pleasure. Those who knew her personally, agreed that she was a person of more than ordinary intelligence and refinement, and was quite agreeable and entertaining in conversation, and some of them thought her very acute in reference to money matters.

Three classes of witnesses testified as to the testamentary capacity of the testatrix at the time she made her will. They were *first* non-expert witnesses, consisting of friends and neighbors and dealers from whom she purchased her domestic supplies and to one of whom she paid a ground rent on her house. The larger part of these persons thought her capable of executing a valid deed or contract, but some of them testified that they had noticed a decided failure of her powers after the death of her brother, and thought her incapable of making a valid deed or contract. We do not review this testimony in detail because of the inconclusive character of such evidence, and because we do not rest our conclusion upon these opinions, but upon facts hereafter to be stated. There is, however, a fact of importance to which quite a number of these witnesses testified, and that is that after the brother's death the testatrix frequently spoke of both him and of her deceased sister as still alive. On several occasions she sent meals upstairs for her sister saying that she was in the house, although she had in fact been dead for some years, and on December 23rd, 1898, not three weeks after making her will, she wrote a long and affectionate letter to her brother, as if he were still alive.

This failure on the part of the testatrix to remember the death of her brother and sister was spoken of in the argument of the case as a delusion, and the law applicable to delusions was much discussed, but we do not think her state of mind in that respect amounted to that persistent or incorrigible belief in facts having no real existence, which is the essential element of a delusion, for the witnesses almost always said that when you reminded her that her brother or sister, as the case might be, had been buried from her house and she had attended the

funeral, her memory would be refreshed and she would reply, I know he is dead, or I remember she is dead, or would make some similar answer.    A delusion is primarily the creation of a perverted or diseased imagination, but her difficulty was rather a failure, for the time being, of her memory.

Medical experts, of whom there were three, constituted the *second class* of the witnesses.    Dr. Weiner, who was her regular physician for thirty years and saw her frequently up to the time of her death, testified distinctly that she was not of sound mind when she made her will and he doubted very much if she was at that time competent to make it.    Dr. Kneass, who attended her during July, August and September, 1899, which was from seven to ten months after she made her will, noticed nothing peculiar about her when he saw her, except that failure of memory which sometimes affects aged persons who are otherwise bright and intelligent.    Dr. John Wood, who was not personally acquainted with her, had a conversation of about fifteen minutes duration with her a year after she made her will and noticed no impairment of her faculties except a failure of memory as to recent events.

The persons present at the execution of the will, including the attesting witnesses, form the *third class* of witnesses.    Of these Mr. Schumacker and Mr. Smith, the druggist, two of the attesting witnesses and also Mr. and Mrs. Lyons and Mr. Denny, who were present at the making of the will, all testified that in their opinion the testatrix was of sound mind and capable of making a valid deed or contract when she made the will.    Of these witnesses Mr. Schumacher and Mrs. Lyons had known her for many years and had frequently had interviews with her of a social nature.    Mr. Lyons had also known her for some years but had not seen her for a year or two prior to the making of the will.    Mr. Smith had no intimate acquaintance with her, and Mr. Denny had never seen her before.

The testimony of Yates Walsh, the other attesting witness, who was absent from the State when he testified, was taken under a commission.    He had known the testatrix for twenty-five years and during the last four or five years saw her every

few days.    Both he and Mr. Schumacher differ from the other
witnesses as to a variety of details incident to the execution of
the will, but Walsh differs essentially from them in his estimate
of the mental capacity of the testatrix.    He placed a low esti-
mate upon her mental condition and distinctly testified that
when the will was made she was not capable of making a valid
deed or contract.    He further testified that on the morning
after the execution of the will the testatrix asked him what
those papers were and referred to the presence on the previous
evening of Mr. and Mrs. Lyons and Mr. Denny and said that
she had been told " that she had made a will and she was very
much surprised and wanted to know what was in it."    He
further testified: " Her memory was very weak at the time of
making the will and continued to get more so up to the time
of her death.    I saw her every few days and sometimes daily ;
she could not remember whether she had money or not, or
that her brother and sister was dead."                    .

The appellees strongly contended that Walsh's testimony
was not entitled to any credit, because at the probate of the
will he had made the usual affidavit as to the condition of the
testatrix when the will was made, without calling attention to
the matters to which he testified under the commission.    This
conduct of the witness is undoubtedly a circumstance to be
considered in estimating the weight of his evidence, but, in
view of the fact that in probating a will in common form the
affidavit which the witness makes is read or repeated to him
and he is not questioned in detail or submitted to cross ex-
amination, we do not feel called upon to reject his evidence
entirely.

After the death of the testatrix's brother William, several
persons suggested to her that she ought to make a will so as
to give the property which she had acquired from him to per-
sons of her own choice, and she proceeded to act upon the
suggestion.    Four papers professing to be her wills appear in
the record.    The first, which bears date the — day of —,
1897, and is duly signed and attested, gives legacies to Dr.
Weiner, Maggie Burford, Minnie Friedley, Mrs. Schumacher

and Miss Fullerton, and also contains a blank residuary clause and a similar one purporting to appoint an executor. The second paper, which is dated the — day of July, 1897, is not signed by her, but it gives legacies to the same persons as the first will did, with the exception of Dr. Weiner, and adds legacies to two orphan asylums and then gives the residue of the estate to her next of kin. The third will, which bears date May 27th, 1898, and is properly signed and attested, gives legacies to the same persons as the previous one, except that the legacy to Dr. Weiner is restored to the will, and one to the Confederate Soldiers' Home is added. This will, like the former one, gives the residue of the estate to the next of kin.

Some time after the execution of the last-mentioned will the testatrix said to Mrs. Lyons, one of the witnesses in the case, that she had made a will and it worried her because she had given some of her estate to her relatives contrary to the express wish of her brother. After some further conversation on the subject, the testatrix requested Mrs. Lyons to ask Mr. Lyons, in whom she expressed confidence, to get her a good lawyer. At the suggestion of Mrs. Lyons, Mr. Denny, who was her husband's regular counsel, was asked to serve the testatrix in the premises.

On the afternoon of December 5th, 1898, Mr. Denny, in accordance with a previous engagement, went with Mr. and Mrs. Lyons to the residence of the testatrix and was then for the first time introduced to her. After some general conversation, Mr. Denny reminded her that he had come at her request to make her will to which she responded, "yes, I requested you to be sent for." He then inquired what her estate consisted of, and she replied in substance that she had a few thousand dollars in a savings bank in Baltimore and that she thought that she had some considerable estate in the hands of Mr. Condit, a New Jersey lawyer, from whom she had gotten money from time to time, but that she did not know how it stood and wanted Mr. Denny to look into it for her.

He then proceeded to draw the will from her dictation in the presence of Mr. and Mrs. Lyons. She directed legacies to be given to each of the legatees named in her last previous will, except Dr. Weiner, and added a legacy to Mrs. Lyons, the legacies amounting in all to but $1,850 and then stopped. Mr. Denny asked what was to be done with the residue, when she replied, according to Mrs. Lyons' very positive testimony, "I really don't know Mr. Denny that I will have more than enough to pay the bequests. Well, he said, if there should be. She said divide it up in four equal parts between Miss Friedley, Mrs. Schumacker, Miss Belle Fullerton and yourself, meaning me."

Mr. Lyons gives substantially the same account of that incident, saying, "Mr. Denny asked what she was going to do with the residue, and she said I don't know that I will have any ; I don't know that I will have enough to pay what I have already mentioned ; she said I never have had any statement or know anything at all of what I have got and I don't know. Well he said there might be something and you had better provide for it; what shall it be ? Well, she thought some moments and she said, oh well, divide it up among the four, Felia and Allie or Mrs. Schumacker and Miss Fullerton and Minnie Friedley." Mr. Denny's own testimony on this subject agrees with that of Mr. and Mrs. Lyons.

Two clauses were then added to the will, one directing the erection of tombstones over the graves of the testatrix and her brother William and her sister, and the other appointing Mr. Lyons and Mr. Denny executors. The will was put in final shape at the same interview and read over to or by the testatrix and then the attesting witnesses were sent for and it was formally executed and was handed by Mr. Denny to Mr. Lyons for safe keeping in her presence without protest or objection from her.

After the will had been finished the parties remained for a short time chatting around the fire and the testatrix spoke to them of her brother William as if he were still living, when Mr. Denny said to her, "Mrs. Lyons or somebody said or you

certainly told me that your brother was dead," whereupon she said "yes, I know he is dead," or "oh yes, I remember, he is dead." On that same evening after the persons who had been there in connection with making the will had gone away she said to her companion, Minnie Friedley, that they had a jolly time, more like a wedding than making a will, and that she did not see why she should leave Mrs. Lyons anything, that she had plenty of money and did not need any of hers, and she expressed a desire to have back the papers Mrs. Lyons had taken away with her.

Mrs. Friedley, the mother of Minnie, testified that on the morning after the making of the will she went to see the testatrix who met her at the door and said, "I suppose you have heard of the scandal last night." Mrs. Friedley said, what is it, and the testatrix replied, "I don't know. I don't know whether I did anything for your daughter." She further said that Mrs. Lyons had taken the will away with her, whereupon Mrs. Friedley advised her to get the will and see what disposition she had made of her property, she replied that she would write for it and did in fact write to Mrs. Lyons a few days thereafter asking her to return her papers. On the same morning of the day after the will was made the testatrix complained to Cephas Johnson also that Mrs. Lyons had taken away a paper that she should not have taken and expressed a purpose of writing for the return of it. We have already referred to the testimony of Yates Walsh as to what she said to him on the morning after the making of the will as to the occurrences of the previous evening.

On December 23rd, 1898, less than three weeks after the date of her will the testatrix wrote a long and affectionate letter, which was found among her papers, to her brother just as if he were still alive, and in the same month she wrote the following remarkable letter to Mr. Condit:

"*Baltimore*, Friday, Dec. 30th, '98.

"MR. CONDIT,

"*Dear Sir:* I've not heard from you for a long time—hope you are well. I am about as usual—sometimes sick and

sometimes well, but never unable to help myself. We are having a lovely winter—at times, like spring, about a year ago you wrote you were about making an arrangement for a sale or lease of some of the ' Jersey Property,' was it a satisfactory one ?    And is there any interest coming *coming* to me ? I've not heard from Brother for a long time—my health is variable—but thus far I've kept along without serious illness. We are having a mild and beautiful winter and our city is generally healthy—Christmas has passed as usual and the ' New Year ' is near at hand.    May we all enjoy it as we can with good health and fair prospects.    Let me hear from you, and if you have anything from my brother please write me. Hoping this will find you in good health, I remain yours truly, Miss Seaver."

Upon the state of facts thus outlined we have arrived at the conclusion already stated as to the want of testamentary capacity on the part of the testatrix when she made her will. She made her arrangements for its execution with deliberation and met Mr. Denny for that purpose at a previously appointed day and hour.    She had been not long prior to that time informed as to the nature and extent of her property in New Jersey and she had occupied the Calhoun street house for more than ten years and had exclusively owned it for more than two years.    Yet when Mr. Denny inquired of what her property consisted, she was able to distinctly remember only the $3,000 in the savings bank which constituted but one-fifth of her estate.    Her mind seems to have been completely blank as to the Calhoun street house and in not much better condition as to the New Jersey property.    When she had made legacies amounting to but $1,850 she doubted whether her estate would be sufficient to meet them and showed an indisposition to make others, and when Mr. Denny advised her that it would be prudent to add a residuary clause and inquired to whom she wished the residue to go, she simply said, " Oh, well, divide it up among the four," mentioning the parties to whom she had by the previous clauses of the will limited her bounty to $250 each.

.Again when the will was drawn she certainly remembered that her brother and sister were dead for she directed her executor to erect tombstones at their graves and yet before Mr. Denny left the room she spoke to him of her brother as still living, although upon having her attention called to the matter she remembered that he was dead. During the same month she wrote the letter to her brother as if he were still alive and stranger still wrote the letter to Mr. Condit showing a state of utter mental confusion alike as to the death of the brother and the state of the property which he left her and of which she had then been in the enjoyment for more than two years. . Furthermore the statements which she made to several of the witnesses on the morning after the will was made as to what she had done on the previous evening greatly strengthen the conviction that she had not that understanding which the law requires of the business about which she was engaged when she attempted to make her will. Then in addition to these facts there is the testimony of Dr. Weiner, who was so long her physician, that she was of unsound mind and he much doubted her capacity to make a will.

Mr. Denny, who had never seen the testatrix before that one interview with her, and had no knowledge at all of her property or of the important facts disclosed by the present record, was evidently misled by her cheerful manner and conversation, when in company with her friends Mr. and Mrs. Lyons, to regard her as competent to make her will, but we cannot with the light now thrown upon the situation sustain the will. The order appealed from must be reversed.

*Order reversed and cause remanded.*