MARY E. BIRCHETT ET AL. *v.* J. HENRY SMITH ET AL., EXECUTORS.

*Mental Capacity of Testator—Evidence—Non-Expert Opinions —Undue Influence.*

That testator gave but a small legacy to his sister, ninety-four years old, did not indicate mental incapacity on his part, she being well taken care of by her son, who had received gifts from testator, was in comfortable circumstances, and not on entirely good terms with testator, and those preferred over her in his will needing his care and aid.               p. 374

Evidence as to facts and conditions on days before or after that on which the will was executed was insufficient to show incapacity on that day, in the absence of any evidence of permanency of such conditions.               pp. 375, 376

Neither age nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a will, if sufficient intelligence remain               p. 376

The "opinion" of a non-expert witness, which is admissible on an issue as to testamentary capacity, is rather a summary statement of acquaintance or familiarity with the fact, usually the fact of permanent or characteristic incapacity, such so-called opinion being not mere opinion, but knowledge.     pp. 377, 378

Non-expert witnesses, not present at the execution of the will, cannot testify as to the progress of the effects of illness on testator's mind, as it appeared to them on visits to the hospital where he died, nor can they express opinions as to his mental capacity when the will was executed, their testimony tending to show that the conditions which they observed on their visits were not permanent and unchanging, but were varying, with mental capacity present most of the time.                    p. 378

Evidence that a beneficiary under the will, whose sister was the largest beneficiary, went to see testator at the hospital on hearing that he had a heart attack, and sent for testator's lawyer, who the next day drew the will, and that such beneficiary later asked "How else could we divide" the estate? did not show undue influence.                                             p. 379

The will of a competent person cannot be nullified for undue influence without affirmative proof of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced testator's action.                    pp. 379, 380

*Decided April 7th, 1926.*

Appeal from the Superior Court of Baltimore City (STEIN, J.).

Caveat proceedings by Mary E. Birchett and others as regards an alleged will of Henry C. Barranger, deceased, to which J. Henry Smith and others, named as executors in said alleged will, appeared as caveatees. From rulings in favor of the caveatees, the caveators appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Charles W. Heuisler* and *J. Stanislaus Cook,* for the appellants.

*Randolph Barton, Jr.,* and *William R. Semans,* for the appellees.

BOND, C. J., delivered the opinion of the Court.

This is an appeal by caveators of a will, from rulings during a trial of issues of fact sent by the Orphans' Court of Baltimore City to the court below, including rulings on prayers by which the jury were directed to find against the appellants' contentions.

Henry C. Barranger, the testator, died at the Mercy Hospital, Baltimore, on December 30th, 1924, of heart failure and hypostatic congestion of the lungs, or hypostatic pneumonia, which is described as a filling up of the lungs upon long confinement to bed, of old patients, especially, and as due to old age and to a condition of the heart. The testator was eighty years old, and was brought into the hospital on November 22d, with an infection of the little toe of one foot, and the region just above it. The infection became gangrenous later, either because operations on the foot interfered with circulation of the blood, or as a result of age. Otherwise, the testator is described by physicians who testified, as having had the ordinary characteristics of old age; hardened arteries and a trace of inflammation in the kidneys. The infection in the foot caused much pain at times. It was dressed twice a day. The daily treatment beyond that is not shown in the testimony, except that during the nights of December 23d and 24th, when the testator suffered an attack of heart failure, he was given doses of sedatives or opiates, and heart stimulants.

It was as a result of the heart attack during the night of December 23d to the 24th, and after having recovered somewhat from it, that the testator asked one of the relatives who had been called to the hospital, to send for Mr. McGrath, his attorney. Mr. McGrath was called on the telephone dur-

ing the same night, went to see the testator in the morning, and then received instructions for preparing the will. He called to see the testator again in the afternoon, and later, at about 7:30 o'clock in the evening of December 24th, brought the completed draft of the will, and it was executed in the presence of Mr. McGrath, and of two nurses who acted as attesting witnesses. Six days later the testator died of another heart attack. .

The issues were the four usually submitted in these cases: (1) whether the will was executed by the testator and attested and subscribed as required by law; (2) whether at that time he was of sound and disposing mind, capable of executing a valid deed or contract; (3) whether the contents were known to the testator or understood by him; and (4) whether the execution of the will was procured by undue influence exerted upon the testator. At the conclusion of the caveators' testimony in chief the jury were directed to answer against the caveators' contentions, all the issues except that concerning mental capacity of the testator, and verdicts were then rendered accordingly. And at the conclusion of all the testimony a verdict against the caveators was directed and taken on the issue concerning the mental capacity.

The caveators, now appellants, contend that there was some evidence to be considered by the jury on the issues concerning mental capacity of the testator and on that concerning procurement of the will by undue influence. And they contend also that in rulings on the admissibility of evidence there was material error, requiring a new trial for its correction.

Nearly all of the testimony in the case was directed to proving that the testator was, at the time of executing the will, deprived, by his illness, of his usual and sufficient mental capacity. The incapacity sought to be proved was not the insanity usually asserted, that is, permanent or habitual lack of mental capacity; all the witnesses agree that up to the last sickness, and at times, at least, during it, the

testator was an uncommonly vigorous man, mentally and
physically. What was sought to be proved was an inter--
ruption or deprivation of this, as an effect of the illness.
None of the witnesses produced to prove it were present at
the execution of the will; all who were present, Mr. McGrath
and the two nurses, testify to full and sufficient capacity
then; and the physicians who were in touch with the case
agree in this. But witnesses who had known the testator
familiarly before his illness, and who visited him during the
five weeks he was in the hospital, testified that on each visit
he seemed to be weaker than before, that he dozed off or
slept frequently, sometimes dozing off during conversations
and failing to take up the conversations where he left off.
The nurses testified that during the ten days before his death
he was delirious at times, and a note was made on the bed-
side chart at 2 A. M. on the morning of December 25th, or
about seven hours after the execution of the will, that "the
patient is irrational, talks a good bit, did not know where he
was." Another witness, Frost, testified to a delirious or
flighty condition on December 26th, two days after the exe-
cution of the will. The testator failed to recognize some of
the witnesses who called, gave the wrong name to one, and
once either referred to an aunt by a wrong name or over-
looked the fact that the aunt of that name had died long
before. His sister's name is also given wrongly in the will.
There was, also, testimony on behalf of the caveators that
at times, during the illness, the testator's face twitched, and
that his jaw would fall to the side, especially when he fell
asleep. Richard T. Birchett, a nephew of the testator, said
that when he called about two hours before the will was exe-
cuted, and when Mr. McGrath was having a preliminary dis-
cussion of the will, the testator's eyes were wild and he was
trembling.

The will contains fourteen distinct legacies, outside of the
residuary clause, and other usual clauses, and is, obviously,
a will that was carefully planned. The testimony of Mr.
McGrath is that the testator alone, on the day the will was

executed, arranged this distribution, after a careful review of his assets.

It has been argued that the giving of a comparatively small legacy in the will to a sister of the testator, the only relative of the same generation, ninety-four years old, and deaf, dumb and blind, and whom the testator held in great affection, is a circumstance which casts suspicion on the testator's capacity, and is, therefore, to be weighed in connection with the other evidence. *Davis v. Calvert,* 5 G. & J. 269, 300. But the admitted facts that the sister was as well taken care of by her son, Richard T. Birchett, as she could be, and that her son, who must very soon receive anything given to her, had already received gifts from the testator, was in comfortable circumstances, and not on entirely good terms with his uncle, together with the fact that others, who were preferred by the testator, needed care and would naturally receive his aid, seem to us to offset the suggestion, and to leave no such ground for reasonable suspicion; and we think that argument may be left aside without further discussion.

There was testimony of several intimations made by the testator of an intention to include various other persons as legatees. *Stewart v. Redditt,* 3 Md. 67, 78; *Malone v. Malone,* 148 Md. 200, 206.

The testimony just outlined, of conditions and actions observed during the testator's illness, is answered for the caveatees by many other witnesses, familiars of the testator, who say that on their visits they observed no interruption of mental capacity, although all agreed that the testator grew physically weaker as time went on. One of the physicians says that he never found any delirium on his visits. This testimony we need not examine now. But in considering the legal value of the testimony of witnesses for the caveators, other facts stated by them, conflicting somewhat with the conclusion sought to be established, are to be weighed. Except for the failure to recognize some witnesses, the miscalling of two names, and two specific instances of irrational or

delirious talk, all of a large number of conversations retailed by these witnesses appear to have been perfectly rational, and no witness suggests that they were not. One of the most important witnesses, Richard T. Birchett, for instance, testified that at five or half-past five o'clock, when he last saw the testator before the execution of the will (two hours before, in fact), he went in to the testator after Mr. McGrath left, and said, "Do you want to see mother?" "He said," the testimony continues, "He said, 'why, is she here?' I said, 'No, sir, she is not here, but I will bring her if you want her.' 'No,' he said, 'don't bring her.' He said, 'You need not bring her here, I will see her, I will see her, we will all meet.' And then I bid him good-bye." Another witness for the caveators, William H. F. Blohm, was, on December 27th, three days later, paid by check, signed by the testator that day, for some turkeys bought and given away for the testator on Christmas.

The caveators offered the conclusions or opinions of five of their witnesses that the testator was mentally incapable at the time of executing the will; four were not permitted to give the testimony, and one, the nephew, Richard T. Birchett, testified that in his opinion his uncle was not capable. These witnesses were to base their conclusions on what they observed on their visits to the hospital, and the facts observed have already been given in general terms, and, we think, sufficiently.

We concur in the conclusion of the trial court that the testimony was not sufficient to support a finding of fact that the testator was of unsound mind when he executed the will. Taking, first, the testimony of facts and conditions actually observed, apart from the opinions offered, we have, on the caveators' side, as has been said, no facts and conditions observed at the very time of execution; and if there is any evidence that the testator was incapacitated then, it can be only by way of inference from conditions on the visits before and after execution. And, of course, to support that inference, the evidence would have to be sufficient to

show that incapacity observed at other times was probably
unchanged at the time of execution; without evidence of
permanency or continuity it would afford no evidence as to
the time in question. In this respect, the case is to be dis-
tinguished from the more familiar one of testimony to habit-
ual or permanent incapacity. In *Hix v. Whittemore,* 4 Metc.
(Mass.) 547, quoted in the leading Maryland case on the
subject (*Townshend v. Townshend,* 7 Gill, 10, 31), the
Supreme Judicial Court of Massachusetts said, "There must
be kept in view the distinction between the inferences to be
drawn from proof of an habitual or apparently confirmed
insanity, and that which may be only temporary. The exist-
ence of the former, once established, would require proof
from the other party, to show a restoration or recovery; and
in the absence of such evidence, insanity would be presumed
to continue. But if the proof only shows a case of insanity,
connected with some violent disease, with which the indi-
vidual is attacked, the party alleging the insanity must bring
his proof of continued insanity to that point of time which
bears directly upon the subject in controversy, and not con-
tent himself, merely, with proof of insanity at an earlier
period." *Brown v. Ward,* 53 Md. 376, 396.; *Struth v.
Decker,* 100 Md. 368, 378 and 379.

Here there is no evidence of incapacity except as the effect
of an illness, and then only as an occasional effect rather
than as a fixed, unchanging one. The testimony of Richard
T. Birchett was the only testimony offered by the caveators
of the condition on the day of the execution of the will, and
about two hours before, and it does not show any actual
incapacity then. It goes so far as to say that while Mr.
McGrath was with him, working over the draft of the will,
the testator had wild eyes and trembled; but it goes no far-
ther, and so much is not saying that the testator was incapable
of executing a will then, for it says nothing about the con-
dition of his mind. "The law looks only to the competency
of the understanding, and neither age nor sickness, nor ex-
treme distress, nor debility of body, will affect the capacity to

make a will if sufficient intelligence remain." Seventh
prayer, approved in *Higgins v. Carlton,* 28 Md. 115, 144.
And evidence of the actual existence of such intelligence, not-
withstanding the appearance to which this witness testified,
is given in his further testimony of the conversation with
the testator about bringing the witness' mother. Not only
then does the caveators' testimony fail to afford evidence of
incapacity at the time of the execution of the will; it rather
tends to contradict it. So the testimony seems insufficient,
even without reference to the clear and direct testimony of
Mr. McGrath and the doctors and nurses, that the tes-
tator was amply competent at the time in question. In
the face of that testimony it is more clearly insufficient.
*Kennedy v. Dickey,* 100 Md. 152, 161; *Struth v. Decker,
supra,* p. 375; *Horner v. Buckingham,* 103 Md. 556, 558;
*Coughlin v. Cuddy,* 128 Md. 76, 79.

As to the opinions of non-expert witnesses offered, our con-
clusion is that these were inadmissible because they lacked
sufficient basis in facts observed for opinions as to the tes-
tator's capacity when the witnesses were not present, and
because they were not, indeed, opinions, within the mean-
ing of the rule for admitting opinions of non-expert wit-
nesses on such a question. The opinions which are admissible
under that rule, are rather summary statements of acquaint-
ance or familiarity with the fact, usually the fact of perma-
nent or characteristic incapacity. "The impression made
upon the mind of the witness by the conduct, manner, bear-
ing, conversation, appearance and acts of the testator in
various transactions, for a long series of years, is not mere
opinion, it is knowledge, and strictly analogous to the cases
of personal identity, and hand-writing, which are constantly
established in the law courts, by the opinion and judgment
of persons who have enjoyed the opportunity of observing
the person, or hand-writing sought to be identified, or
proved." *Townshend v. Townshend, supra,* p. 28. And in
the case just quoted, the Court included among its authori-
ties this statement of Baron Alderson, in *Wright v. Tatham,*

5 Cl. & F. 670: "I conceive this question really means to in-
volve an inquiry, as to the effect of all the acts which the
witnesses had seen the testator do for a long series of years,
and the manner in which he was, during that period, treated
by those with whom he was living in familiar intercourse.
This is not properly opinion, like that of experts, but is rather
a compendious mode of putting one instead of a multitude of
questions to the witness under examination, as to the acts and
conduct of the testator. He may state the result, not as
opinion, but as knowledge, precisely as he may do when ques-
tions of personal identity or handwriting are involved."
*Berry Will Case,* 93 Md. 560; *Whisner v. Whisner,* 122
Md. 205.

What the five witnesses offer to give in this case would
seem to be a different thing. They would testify, not to a
characteristic condition with which they have been made
familiar, but to the progress of the effects of illness on the
testator's mind, as it appeared to them on visits to the hospi-
tal. And while as to the conditions they actually observed
on their visits, they might have knowledge to give to a jury,
it seems to us that in this case, they could extend their testi-
mony to cover the mental condition when they were not pres-
ent, only by resorting to conjecture or speculation. They are
not physicians, and so could not speak from close examina-
tion of the patient, and an expert knowledge of the course
of the conditions ascertained. They could not know that the
conditions which they saw were unchanging. As they de-
scribe them, there appears to be nothing essentially perma-
nent and unchanging, and, on the contrary, their own testi-
mony tended to show the conditions to be varying, with men-
tal capacity present most of the time. We are led to con-
clude that these witnesses had a mistaken idea of legal capac-
ity. At any rate, we agree that they had no sufficient basis
for an opinion that the requisite capacity was lacking when
the will was executed. The trial court correctly excluded the
opinions which it did exclude, and correctly disregarded that
of the witness, Birchett, when it instructed the jury on the

legal sufficiency of the evidence. *Stewart v. Redditt, supra,* p. 79; *Dorsey v. Warfield,* 7 Md. 65, 74; *Berry Will Case,* 93 Md. 560, 579 to 580, and 590; *Kennedy v. Dickey, supra,* pp. 159, 161 and 163; *Horner v. Buckingham, supra,* p. 560; *Baugher v. Gesell,* 103 Md. 450, 460.

On the question of procurement of the execution of the will by undue influence exerted upon the testator, there is little or no testimony to be considered. The caveatees argue that evidence may be found in the facts that a nephew of the testator, J. Henry Smith, whose sister is the largest beneficiary under the will, and who is, himself, a beneficiary in a smaller amount, went to the testator on receiving news of the heart attack during the night of December 23rd, and sent out the message that the testator wanted Mr. McGrath to come on the next day, and that Mr. Smith was at the hospital on the next afternoon when Mr. McGrath was there. It is added, however, that he was ordered by Mr. McGrath to withdraw during the conference with the testator. In addition there is testimony of a statement made by Mr. Smith later: "Well, what could Mr. Birchett's mother expect? How else could we divide it anyhow?" There is no direct evidence of undue influence, or even of a recommendation or suggestion made to the testator. There is hardly foundation for a reasonable suspicion of undue influence in this, and, clearly, we think, none for a judicial finding of fact. *Struth v. Decker, supra,* p. 377. In *Kennedy v. Dickey,* 100 Md. 152, 164, this Court quoted and adopted the statement of the Supreme Court of the United States, in *Beyer v. LeFevre,* 186 U. S. 125, that "whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the federal courts, that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason." "Mere conjecture, or a suspicious circumstance, or even an influence or constraint, if not directly connected with the will in the sense of being its procuring cause, will not be sufficient. The

will of a competent person cannot be nullified on the gound of undue influence without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator." *Malone v. Malone,* 148 Md. 200, 208. Tested by these requirements the evidence in the present case is insufficient to prove the procurement by undue influence.

On the evidence admitted, then, we find the action of the trial court in all respects correct. There are twenty-one exceptions to rulings on objections to evidence, but after having examined these we have concluded that we should not be justified in discussing any of them at length. Most of the evidence, to the exclusion of which exceptions were taken, was given to the jury by the same witnesses on examination later in the trial; and in none of the rulings on the remaining exceptions does there appear to us to have been reversible error.

*Rulings affirmed.*