WILLIAM F. DOYLE *v.* BENJAMIN F. RODY, ADMINISTRATOR, ETC.

[No. 13, January Term, 1942.]

472

*Decided April 8, 1942.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, and MARBURY, JJ.

*F. Neale Parke* and *D. Eugene Walsh* for the appellant.

*Michael J. Manley*, with whom were *A. Earl Shipley* and *Julius A. Victor, Jr.*, on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

The issue in this case is whether Matthew T. Doyle, now deceased, had sufficient mental capacity to open two accounts in the First National Bank of Westminster in December, 1939, in trust for himself and his brother, William F. Doyle, appellant.

After separating from his wife in Delaware in 1937, Doyle, having no children, lived in a boarding house in Baltimore. In 1939, when he was sixty-eight years old, he was paralyzed in his right arm. He was examined at the Mercy Hospital Clinic on December 1, 1939, by Dr. Philip F. Lerner, a specialist in neurology, who found that he had cerebral arteriosclerosis, senile deterioration and softening of the brain, and an increase in blood cells, which caused him to be mentally abnormal and confused. However, on December 3, he was able to visit his brother in Westminster, returning to Baltimore on the following day.

On the evening of December 6, 1939, Doyle wandered into the Southwestern Police Station in a dazed condition. He was unable to tell his name, but mumbled that he had been robbed. The desk lieutenant ordered the turnkey to give him a cell and search him for marks of identification. He wore an overcoat and two suits of clothes, but no stockings. The turnkey found that he had three bottles of medicine, $26.47 in cash, and a bank book of the Savings Bank of Baltimore showing that he had on deposit in that institution more than $11,000. He also had a note book containing the name of Mrs. Edgar Patterson, who, when called on the telephone, was found to be his niece. Mrs. Patterson and her husband arrived shortly afterwards and took him

to their home on Wickham Road, gave him hot tea, and put him to bed.

On the following day Mrs. Patterson took her uncle in a taxicab to the savings bank, where he inquired about an old bank book. From there she took him to his boarding house on Fayette Street to get some clothes. Unable to recall the number of the house, he walked up and down the street with his niece for some time until they finally located the right place. On returning home Mrs. Patterson took his bundle of clothes and a tin box to his room, but had great difficulty in persuading him that his clothes had not been left in the back yard. Taking him upstairs to his room, she finally convinced him that his clothes had not been thrown away. On the next morning she called her family physician to attend him, but just as the doctor arrived at the front door, Doyle darted out the back door, refusing to have any medical attention. On Saturday, December 9, he went for a walk, saying he would be back in time for lunch, but he never returned. That evening he appeared again at his brother's home in Westminster, where he said: "The Pattersons have been trying to hold me, and I want to stay here with you people. * * * Those people are ganged up against me and I am afraid of them." On the following Monday his brother took him to see a lawyer to arrange for a disposition of his estate. On Tuesday, December 12, he was taken to the First National Bank, where he signed a draft for $11,427.71 on the Savings Bank of Baltimore. The Savings Bank asked for a doctor's certificate showing that there was no mental disability of the depositor; so, on December 16, Doyle was taken to the First National Bank again, and given a physical examination by Dr. W. Glenn Speicher, of Westminster, in the presence of Dr. Lewis K. Woodward, president of the bank. Dr. Speicher observed that Doyle had suffered a slight stroke, indicating a hemorrhage in the brain, and that he had some cerebral pressure which affected his mental faculties to some extent; but he certified on the back of the draft that Doyle was of sound and disposing mind.

It was on December 22 that a joint savings account of $11,000 and a joint checking account of $427.11 were opened in the bank in trust for Matthew T. Doyle and William F. Doyle, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor. These trusts, if valid, would disinherit Doyle's wife, another brother, the issue of a deceased brother, and the issue of a deceased sister. On December 30 Doyle, then in a semiconscious and stuporous condition, was removed, upon Dr. Speicher's advice, to the University Hospital in Baltimore. Dr. Harry V. Langlettig, a specialist in internal medicine, diagnosed his case on that day as hypertensive cardio-vascular renal disease, cerebral hemorrhage and generalized arteriosclerosis. Doyle died on January 8, 1940.

Benjamin F. Rody, administrator of the estate, alleged in the bill of complaint that Doyle's mind had been so greatly weakened that he did not understand that he was establishing trusts, and that the defendant had induced him to establish them by artifice and undue influence. The chancellors decreed that the bank accounts were the property and estate of Matthew T. Doyle, deceased, and were payable to the administrator.

It is expressly provided by statute in this State that no will shall be valid unless the testator is of sound and disposing mind and capable of executing a valid deed or contract. Code, 1939, Art. 93, Sec. 335. This rule is likewise applicable to disposition of property by creation of a trust. It has been stated by this court that a testator, to be considered of sound and disposing mind, must understand the nature of his act and its effects, the extent of the property of which he intends to dispose, the person to whom he means to give it, the manner in which he is disposing of it, and the relative claims of the different persons who are or should be the objects of his bounty. *McElwee v. Ferguson,* 43 Md. 479, 484; *Davis v. Denny,* 94 Md. 390, 50 A. 1037. The fact that the grantor in a conveyance was debilitated by illness at the time he executed it does not necessarily imply an ab-

sence of sufficient capacity to dispose of property by gift or otherwise. The weakening of a person's mind is not sufficient to destroy the validity of his conveyance where he still retains a full comprehension of the meaning, design and effect of his act at the time of its execution. Inasmuch as the law looks in such cases to the competency of the understanding, it is manifest that advancing years and bodily infirmities do not of themselves deprive a person of capacity to enter into a contract or dispose of property by will or otherwise. *Birchett v. Smith*, 150 Md. 369, 133 A. 117; *Cronin v. Kimble*, 156 Md. 489, 144 A. 698. While the law presumes sanity and testamentary capacity, yet when it appears that a person was in such an enfeebled condition of mind and body immediately before and immediately after the date of a transaction as to render him incompetent to transact business, the presumption arises that he was unable to understand what he was doing at the time of the transaction, and the burden of proof as to his capacity to dispose of his property at that particular time is imposed upon the grantee. *Brown v. Ward*, 53 Md. 376, 387, 396, 36 *Am. Rep.* 422; *Davis v. Denny*, 94 Md. 390, 50 A. 1037; *Ralston v. Turpin*, 129 U. S. 663, 9 S. Ct. 420, 32 L. Ed. 747.

In the case at bar Dr. Lerner and Dr. Langlettig testified from personal examination that Doyle's disability was chronic, progressive, and incurable, and expressed the opinion that he could not possibly have had any lucid intervals in the month of December, 1939. It was argued by the appellant that Dr. Lerner's testimony was inadmissible because there was doubt about Doyle's identity, since the date on the label on one of the medicine bottles appeared to be 1937 instead of 1939. However, Dr. Lerner testified that he had examined a patient giving his name as "Matthew Doyle" on December 1, 1939; that the patient had a slow, shuffling walk, which was characteristic of Matthew T. Doyle; and that the medicine in one of the bottles in Matthew T. Doyle's tin box was precisely the kind prescribed by Dr. Lerner on

December 1, 1939, and bore the label of the Mercy Hospital Dispensary. We sustain the ruling that Dr. Lerner's testimony was admissible.

The opinions of Dr. Lerner and Dr. Langlettig were substantiated by Dr. Irving J. Spear, head of the Department of Nervous Diseases in the Medical School of the Univresity of Maryland, and by Dr. Andrew C. Gillis, who has taught this subject for many years at the University of Maryländ and the Johns Hopkins University. After hearing all of the testimony, Dr. Spear and Dr. Gillis expressed the opinion that Doyle could not possibly have been of sound and disposing mind in December, 1939. The opinions of medical doctors are admissible in evidence as to sanity or insanity because they have become familiar by study and eperience with the symptoms of mental diseases, and therefore qualified to assist the court or jury in reaching a correct conclusion. Such opinions may be based either upon facts within their personal knowledge or upon a hypothesis disclosed by the testimony of others. *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59; *Mathiesen Alkali Works v. Redden*, 177 Md. 560, 10 A. 2d 699; *Langenfelder v. Thompson*, 179 Md. 502, 20 A. 2d 491, 136 *A. L. R.* 960. It is also held that a qualified expert, who has been present during the whole course of a trial and has heard all of the testimony can be asked for an opinion based upon the evidence. *Baber v. John C. Knipp & Sons*, 164 Md. 55, 163 A. 862.

Irrespective of the difference of opinion between Dr. Speicher and the four Baltimore specialists on the issue of insanity, the court has no difficulty in reaching the ultimate decision of this case on the ground of insane delusion. It is true that mere eccentricities or peculiarities of behavior are not of themselves sufficient to constitute mental incapacity. *Henry v. Leech*, 123 Md. 436, 91 A. 694; *Mecutchen v. Gigous*, 150 Md. 79, 132 A. 425. But the law is settled in this State that when a testamentary disposition is the direct consequence and offspring of the testator's delusion, which was calculated

to pervert his judgment and control his will in respect to the disposition of his estate, the court should hold that he did not possess testamentary capacity, although he may have been rational and sane on other subjects. *Townshend v. Townshend*, 7 Gill 10, 32, 33. It has been specifically held by this court that a violent dislike for one's near relatives, when founded upon an insane delusion, may be proof of his insanity. *Brown v. Ward*, 53 Md. 376, 388, 392, 36 *Am. Rep*. 422. The law of insane delusion was expounded in England by Chief Justice Cockburn in the following manner: "The pathology of mental disease and the experience of insanity in its various forms teach us that while, on the one hand, all the faculties, moral and intellectual, may be involved in one common ruin, as in the case of the raving maniac, in other instances one or more only of these faculties or functions may be disordered, while the rest are left unimpaired and undisturbed; that while the mind may be overpowered by delusions which utterly demoralize it and unfit it for the perception of the true nature of surrounding things, or for the discharge of the common obligations of life, there often are, on the other hand, delusions, which, though the offspring of mental disease and so far constituting insanity, yet leave the individual in all other respects rational, and capable of transacting the ordinary affairs and fulfilling the duties and obligations incidental to the various relations of life. No doubt when delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound * * *. It is essential to the exercise of such power * * * that no disorder of the mind shall poison his affections, pervert his sense of right, or prevent the exercise of his natural faculties— that no insane delusion shall influence his will in disposing of his property and bring about a disposal of it which, if the mind had been sound, would not have been made. * * * If the human instincts and affections, or the moral sense, become perverted by mental disease;

if insane suspicion, or aversion, take the place of natural affection; if reason and judgment are lost, and the mind becomes a prey to insane delusions, calculated to interfere with and destroy its functions, and to lead to a testamentary disposition, due only to their baneful influence—in such a case it is obvious that the condition of the testamentary power fails, and that a will made under such circumstances ought not to stand." *Banks v. Goodfellow,* 5 L. R. Q. B. 549, 560, 565.

In order to set a will aside on the ground of a delusion, it is necessary to show (1) that the delusion was an insane delusion, and (2) that the will was the consequence of the delusion. *Johnson v. Johnson,* 105 Md. 81, 65 A. 918, 121 *Am. St. Rep.* 570; *People v. Hubert,* 119 Cal. 216, 51 P. 329, 63 *Am. St. Rep.* 72, 94-100. The evidence in this case shows that Doyle was laboring under a delusion that he had been robbed. This was his principal thought when he wandered into the Southwestern Police Station. The delusion was subsequently directed against his niece. He believed she was conspiring with her husband to injure and rob him. As a matter of fact, she had treated him with unusual kindness. The case falls within the definition of an insane delusion: a false belief for which there is no reasonable foundation, and which would be incredible under similar circumstances to the same person if he were of sound mind, and concerning which his mind is not open to permanent correction through argument or evidence. *Walker v. Struthers,* 273 Ill. 387, 112 N. E. 961, 966; 32 *C. J., Insane Persons,* Sec. 52. Moreover, the creation of the trusts in this case was an offspring of the insane delusion.

It is recognized, of course, that aged and infirm persons *in extremis* may be easily imposed upon by those in whom they confide. When, therefore, a relative or friend arranges for the preparation of such a person's testamentary disposition in his own favor, such an act generally excites suspicion. And where it is found that a person was so weak in mind or body that he was a mere passive instrument in the hands of others, and the court can

presume that the person through whose influence the will was made for his own benefit was conscious that he was obtaining an unjust disposition, it is obvious that the will should not be permitted to stand. *Harvey v. Sullens,* 46 Mo. 147, 151, 2 *Am. Rep.* 491; 28 *Am. Jur., Insane and Other Incompetent Persons,* Sec. 67. In this case neither the president of the bank nor the cashier could recall who had requested that the accounts be opened in trust form. They were unable to say whether Doyle had indicated that he wanted his brother to have the money, or whether anyone had explained how the money would pass upon his death. The facts in this case are somewhat similar to *Cherbonnier v. Evitts,* 56 Md. 276, 279, 294, where Judge Ritchie said: "Unsoundness of mind, when not reaching to mania or idiocy, is compatible with the semblance of perfect reason on occasion or for a period; and, where undue influence has been craftily applied, it so insidiously possesses the mind of its victim with false impressions or delusions, that he often voluntarily, and even eagerly, performs the act, into which he has been skilfully duped. * * * The law is jealous to defeat a fraudulent use of the means afforded by intimacy of association. And it is not * * * inconsistent with the exercise of undue influence or artifice, that the instrument assailed was executed voluntarily, and with a knowledge of its contents." It does not necessarily follow, therefore, merely because Doyle willingly signed his mark, that in the eyes of the law he was capable of making a valid deed or contract.

The appellant complained because Dr. Woodward, who is a physician, was not allowed to give his opinion as to Doyle's mental capacity, whereas Mrs. Patterson was allowed to express such an opinion. The chancellors excluded Dr. Woodward's opinion on the ground that it was as a bank president that he met Doyle and that he saw him but a short while. Inasmuch as Dr. Woodward was present when Dr. Speicher made the examination, he should have been allowed to express his opinion. A physician, after sufficient opportunity for observation,

may express his opinion of a person's mental capacity without giving any reason for his opinion. *Love v. Love,* 158 Md. 481, 148 A. 814. However, we do not find reversible error in the rulings of the chancellors since there was an abundance of evidence to show insane delusion. The statement of a non-expert witness as to the sanity or insanity of an individual, whose appearance and conduct came under his personal observation, is not the expression of mere opinion, but actual knowledge of the fact of permanent or characteristic incapacity. In form, it is an opinion because it expresses a conclusion or inference based upon observation, and the witness could not very well communicate a correct idea without embodying his impressions or judgment to a certain extent. But, in substance, the mental condition of a person is a fact, and the opinion of a witness who had had opportunities to observe his appearance and conduct is in reality a statement of the fact. Of course, it is not usually established by positive proof, because in most cases it is impossible to determine the mental condition of another person with absolute certainty. Nevertheless, an opinion based upon actual observation according to ordinary manifestations and common experience is knowledge as far as the human intellect can acquire knowledge upon such subjects. This kind of evidence is admissible on an issue as to testamentary capacity because of the intrinsic value of the observation of persons of intelligence. *Birchett v. Smith,* 150 Md. 369, 133 A. 117; *Connecticut Mutual Life Insurance Co. v. Lathrop,* 111 U. S. 612, 4 S. Ct. 533, 28 L. Ed. 536. But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion. *Wood v. Hankey,* 133 Md.

389, 397, 105 A. 430; *Cronin v. Kimble,* 156 Md. 489, 144 A. 698; *Smith v. Biggs,* 171 Md. 528, 189 A. 256.

Since it appears from the preponderance of the evidence that Doyle was not mentally capable of creating the trusts in this case, the decree of the chancellors will be affirmed.

*Decree affirmed, the costs to be paid out of the estate.*

SLOAN, J., dissents.